WILLIE TRIPP, THE YOUNGER *v.* STATE OF MARYLAND

[No. 1028, September Term, 1976.]

*Decided June 13, 1977.*

460

The cause was argued before MOYLAN, POWERS and MOORE, JJ.

*James M. Kramon, Assigned Public Defender,* with whom were *Kramon & Graham* on the brief, for appellant.

*Stephen B. Caplis, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, William A. Swisher, State's Attorney for Baltimore City,* and *Sam Brave, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

Murder, which is unmitigated homicide, stands higher on the ladder of culpability than manslaughter, which is mitigated homicide. Because the negative element of non-mitigation is initially presumed, *Evans v. State,* 28 Md. App. 640, 722-730, 349 A. 2d 300, and need not be proved unless and until a genuine jury question as to mitigation has been raised, the State leaps at a bound to the murder plateau when it shows an intentional killing by the defendant. It does not pass upward through the manslaughter level; it rather leapfrogs the manslaughter level and is not obliged to go back for the "mop-up" operation of negating mitigation unless the defendant meets his production burden so as to necessitate the "mop-up." The false assumption that the State passes upward through the manslaughter level, rather than initially bypassing that level, has engendered thousands of unnecessary digressions upon the law of manslaughter which are as utterly unrelated to the jury business at hand as would be a discussion of the causes of the War of the Spanish Succession.

We described the problem in *Evans v. State, supra,* at 28 Md. App. 665:

> "As boiler-plate instructions have been handed down from judicial generation to judicial generation and solemnly intoned whether they have any bearing on the case then at bar or not, [9] there have been frequent occasions when erroneous jury instructions have been given but where the error has no conceivable relevance to any issue in the case.

_____

9. Whenever a 'canned' set of jury instructions is resorted to, the man behind the can has an all-too-frequent way of going

> intellectually onto 'automatic pilot.' Once the liturgy begins, it will drone on to its bitter end, running the full gamut of homicidal mental states, the immaterial as well as the material. The only saving grace about the typical 'canned' instructions on the subject of homicide is that full half of the multitudinous errors are not remotely in the ball park of materiality."

The appellant, Willie Tripp, observes that it has been the ingrained habit of many members of the judiciary, when instructing a jury on the subject of homicide, to catalog all the varieties thereof, defining each and setting out the penalty for each. That observed phenomenon, sadly to relate, is true; it is also unfortunate. Commendably, Judge Marshall A. Levin in the Criminal Court of Baltimore had the consummate wisdom and the intellectual boldness to decline so to clutter the minds of the fact finders with extraneous and irrelevant law. At the end of the case, the appellant timely requested an advisory instruction on the law of manslaughter. Judge Levin declined to give it and told the jury simply that all unlawful homicide "is divided into two classes: murder and manslaughter. We are going to deal with murder only in these cases." The appellant claims error. Our response to that non-instruction can be summed up in a single word, "Bravo!"

### The Gross Facts

On October 12, 1974, the appellant went on a homicidal rampage at 1700 Guilford Avenue in Baltimore City with a .38 caliber revolver. He shot in the chest and killed 36-year-old Hazel Wilson, with whom he had been cohabiting over a two-year period until roughly one week before the killing. The appellant also shot seven-year-old James Wilson, son of Hazel Wilson, twice in the head, killing him. He also shot eleven-year-old Deborah Brewer, niece of Hazel Wilson, once in the head, killing her. He also shot 62-year-old Sarah Brewer, mother of Hazel Wilson, several times in the head and face, killing her. He also shot eleven-year-old Derak Wilson, son of Hazel Wilson, once in the face, seriously wounding him. There was no dispute as to the homicidal agency of the appellant — only as to his *mens rea* in two regards. The jury found the appellant to have

been sane at the time of the attacks. The jury found the appellant guilty of four charges of murder in the first degree and of one charge of assault with intent to murder.

## When Jury Instructions are Required

The first of the appellant's contentions which we shall discuss is his claim that Judge Levin committed prejudicial error by declining to instruct the jury on the subject of manslaughter. Although we find no ultimate merit in the claim, we initially agree with the appellant that he is not foreclosed from raising it by anything in *Dorsey v. State*, 278 Md. 221, 362 A. 2d 642; *Dorsey and Wilson v. State*, 29 Md. App. 97, 349 A. 2d 414; or *Evans v. State*, 28 Md. App. 640, 658-662, 349 A. 2d 300. All of those cases dealt with the problem of the erroneous allocation of the burden of proof to the defendant on the subject of mitigation. The appellant's present claim is that the lack of any instruction at all as to manslaughter effectively precluded the jury from considering it, above and beyond any procedural question as to burdens of proof or allocations thereof. The present claim is substantive and not procedural.

The appellant is, furthermore, correct in his preliminary assertion of law that a trial judge is obliged to instruct the jury on every essential point of law supported by the evidence when requested to do so by either side. *Christensen v. State*, 274 Md. 133, 139, 333 A. 2d 45, 48; *Mason v. State*, 12 Md. App. 655, 661, 280 A. 2d 753, 758; *Gaskins v. State*, 7 Md. App. 99, 105, 253 A. 2d 759, 763.

The chink in the appellant's armor is the phrase "supported by the evidence." When instructing on the law of homicide, as when instructing on any other part of the law, it is not only not required but it is, indeed, inappropriate to instruct upon a principle of law not suggested by the evidence in the case. We discussed this at great length in *Evans v. State*, at 28 Md. App. 665, 669, and it is unnecessary here to replow that ground. See also *Gilbert v. State*, 36 Md. App. 196, 373 A. 2d 311 (1977).

The appellant urges that it is necessary to discuss manslaughter because it involves the same *corpus delicti*

and the same homicidal agency as are involved with the murder charge but simply a lesser degree of blameworthiness — a diminished *mens rea.* This does not serve to relieve the appellant of the necessity that each principle of law to be discussed — even those involving a diminished *mens rea* for the same offense — must be supported by the evidence in the case. Intoxication, for instance, may serve to lower a homicidal *mens rea* from first degree to second degree, but no instruction should be given where the evidence is not legally sufficient to generate a genuine jury issue as to intoxication. *Bateman v. State,* 10 Md. App. 630, 272 A. 2d 64; *Mock v. State,* 2 Md. App. 771, 237 A. 2d 811. Insanity would extinguish the *mens rea* completely but no instruction on that issue should be given, absent a genuine jury question. *Bremer v. State,* 18 Md. App. 291, 315-316, 307 A. 2d 503; *Dennis v. State,* 13 Md. App. 564, 569, 284 A. 2d 256; *Strawderman v. State,* 4 Md. App. 689, 698, 244 A. 2d 888. Self-defense could extinguish the *mens rea* entirely but no instruction thereon is appropriate, absent the generation of a genuine jury issue. *Street v. State,* 26 Md. App. 336, 338-341, 338 A. 2d 72. Entrapment could extinguish a *mens rea* but no instruction thereon is appropriate, absent a genuine jury issue. *Fisher v. State,* 28 Md. App. 243, 345 A. 2d 110.

As to the quantum of evidence necessary to generate a jury issue, as a predicate for a requested instruction, Judge Powers cogently spelled it out in *Fisher v. State, supra,* at 28 Md. App. 248-249:

> "It should here be emphasized that the defense of entrapment cannot be considered as 'having been raised' — that entrapment cannot become an issue for the trier of the facts — unless there is sufficient evidence which, if deemed weighty and credible by the trier of the facts, would support a finding that the police, directly or through their agent, induced the defendant to commit the offense charged. . . .
>
> The initial test of the evidence, within the framework of the substantive law of entrapment, is always a matter of law for the court."

The notion that manslaughter needs to be defined in the abstract, absent any legally sufficient supporting evidence thereof, is preposterous. Manslaughter is not a monolith but an umbrella term embracing a broad miscellany of unlawful but non-murderous homicides. In the abstract, should a jury be instructed as to involuntary manslaughter based upon gross negligence or as to voluntary manslaughter under extenuating circumstances? If the latter, should the theory of possible mitigation to be discussed be that of imperfect self-defense, that of imperfect duress, that of imperfect necessity, that of imperfect right to prevent a felony or that of provocation? If the latter, should the variety of provocation to be discussed be that based upon a battery, upon mutual combat, upon assault, upon illegal arrest, upon injury to close relatives or upon the sudden discovery of a spouse's adultery? The very catalog of questions dictates the answer. Absent a full semester to be devoted to the entire corpus of homicide law, instructions must be restricted to those legal principles supported by the evidence and therefore material to the case at hand.

### The Species of Extenuation Urged Herein

In appellate brief and argument, though not in the trial evidence, the appellant has narrowed the focus of pertinent manslaughter relief. It is not involuntary manslaughter but voluntary manslaughter being urged by him. He narrows the focus further by claiming mitigation through hot-blooded response to legally adequate provocation. The suggested form of the legally adequate provocation is strangely blurred but seems to bear an at least impressionistic resemblance to that involving the sudden discovery of a spouse in an act of adultery. We will now turn to an examination of whether the evidence supports the necessary elements for extenuation of this variety.

### The General Law as to Provocation

In *Whitehead v. State*, 9 Md. App. 7, 10-11, 262 A. 2d 316, Judge Orth set out fully the elements of provocation:

> "[T]here may be a homicide which would otherwise
> be murder which is reduced to manslaughter by

circumstances of alleviation or mitigation. Such a case is where the circumstances surrounding the homicide establish that it was provoked. For the 'Rule of Provocation' to be invoked there are four requirements:

(1) There must have been adequate provocation;

(2) The killing must have been in the heat of passion;

(3) It must have been a sudden heat of passion — that is, the killing must have followed the provocation before there had been a reasonable opportunity for the passion to cool;

(4) There must have been a causal connection between the provocation, the passion, and the fatal act."

Against these bench marks, we will now measure the evidence at hand.

### Extenuation Limited to the Killing of Provocateurs

Except for rare instances of "transferred intent," where one aims at A, misses and hits B by mistake, a defendant seeking to extenuate an intentional killing upon the theory that he killed in hot-blooded rage brought on by the provocative acts of his victim is limited to those killings where the victim is the provocateur. In the present case, Hazel Wilson was the only victim arguably in that category. In no event could the killings of Hazel Wilson's 62-year-old mother, her 11-year-old niece, her 7-year-old son nor the murderous wounding of her 11-year-old son be mitigated by even hot-blooded response to actions not of their doing. Even as the discussion moves forward in the case of Hazel Wilson, the other four convictions are factored out as objects of this contention. In this regard, LaFave and Scott, *Criminal Law* (1972), is unequivocal, at 582:

"More difficult is the situation in which A, actually and reasonably provoked by B, in his

passion strikes out at and kills C, known by A to be only an innocent bystander. The courts have quite consistently held that the killing of C does not qualify as manslaughter, apparently upon the assumption that a reasonable man would never be so greatly provoked as to strike out in blind anger at an innocent person."

And see *Dow v. State*, 77 Ark. 464, 92 S. W. 28 (1906); *State v. Vinso*, 171 Mo. 576, 71 S. W. 1034 (1903); *White v. State*, 44 Tex. Crim. 346, 72 S. W. 173 (1902); *Regina v. Scriva*, [1951] Vict.L.R. 298 (not manslaughter where defendant saw his child hit by car, attempted to attack driver, and then turned on bystander who tried to stop him and killed bystander); *Rex v. Simpson*, 84 L.J.K.B. 1893, 31 T.L.R. 560 (Ct. Crim. App. 1915) (defendant-father's child was sick; mother refused to come home; father in anger at mother killed child; held, murder, not voluntary manslaughter).

Perkins, *Criminal Law* (Second Ed., 1969), makes the same point, at 69:

"Additional light may be thrown upon this subject by reference to an exceptional situation. If one who has received adequate provocation is so enraged that he intentionally vents his wrath upon an innocent bystander, causing his death, he will be guilty of murder; but if his deadly force was directed at the provoker and hit the other by accident, or if as a reasonable mistake of fact he thought the provocative act had been perpetrated by the deceased, he is guilty of manslaughter only, if he otherwise meets the requirements of the rule of provocation."

### Provocation in the Case of Hazel Wilson

The appellant is in deep trouble when it comes to the legal sufficiency of the evidence to establish the elements of provocation. There must, of course, be established all of the elements. We conclude that the appellant failed to establish

at least three of the necessary four elements. Taking the evidence in the light most favorable to the appellant, with all inferences that fairly can be drawn therefrom, he may arguably have a jury issue with respect to the fourth element:

> "(4) There must have been a causal connection between the provocation, the passion, and the fatal act."

The story that emerges, from the testimony of the 11-year-old boy who lived and from the testimony of a neighboring minister who had but scant knowledge, is at best a surrealistic blur. It appeared that the appellant had been living with Hazel Wilson and her two sons for approximately two years, the last two months of which had been in the second-floor apartment at 1700 Guilford Avenue. When she would go out drinking or would make periodic visits to her former husband (or actual legal husband, for all we know), the appellant would be afflicted by fits of jealousy. He would beat Hazel Wilson. One week before the killings, the minister observed the appellant, gun in hand, dragging Hazel Wilson along. Six days before the murders, he came to the minister's church, where Hazel Wilson was then visiting, also with a gun in his hand. Events reached a critical impasse on the Tuesday, four days before the killings, when Hazel Wilson and her sons moved downstairs to the first-floor apartment and moved in with Hazel Wilson's mother. Arguments and efforts to get Hazel Wilson to return to the apartment with the appellant continued sporadically throughout the final week.

From this, it might fairly be inferred that the actions of Hazel Wilson 1) in going out and drinking, 2) in visiting periodically her husband (or ex-husband) and 3) in moving out of the second-floor apartment had provoked a passion in the appellant and that that passion was the effective cause of his decision to kill Hazel Wilson. This, however, is but one of four constituent elements, all of which must be present for legally recognizable provocation.

We turn our attention to the second necessary element:

"(2) The killing must have been in the heat of passion."

This is the subjective question of whether a particular defendant was actually in the heat of passion when he killed. (The objective, or reasonable man, question will constitute the next element to be considered.) All of the evidence in the case, clearly and decisively, indicated that the appellant was not in the heat of passion when he killed. At least a week had elapsed since the onset of domestic argument with Hazel Wilson. Four days had elapsed since she moved downstairs. Several hours before the killing, he utilized a ruse, directed toward Hazel Wilson's mother, in order to gain entrance to the downstairs apartment and particularly to the basement, where he manipulated in some fashion the lock to the basement door. After killing Hazel Wilson, he attempted to lure the other members of the family out of hiding in what inferentially appeared to be an effort to kill all witnesses to his first killing. The gun that he used was never recovered. He wore gloves at the time of the killing. He was seen by one witness in a West North Avenue grocery store less than an hour after the killing, blithely buying groceries. When he returned to the crime scene between one and one-half and two hours after the killings, he approached, with groceries in hand, feigning total ignorance of and surprise at the situation he there found.

Counterbalancing this evidence of actual, cool deliberation is not one shred of evidence indicating hot-blooded fury. In this case, the only available source of such evidence, the appellant himself, chose not to testify in this regard. We feel in this case as we did in *Bartram v. State*, 33 Md. App. 115, 175, 364 A. 2d 1119:

"The blood, however, must indeed be hot and, generally speaking, only the hot-blooded killer can attest to that."

We discern no legally sufficient evidence to establish that the appellant here did actually kill while in the heat of passion.

The next element to be considered is the third:

"(3) It must have been a sudden heat of passion — that is, the killing must have followed the provocation before there had been a reasonable opportunity for the passion to cool."

This element is the objective counterpart of the preceding one. We were there concerned with the subjective question of whether this particular killer was still in the throes of actual hot-blooded passion. We are here concerned with the objective test of whether there had been a sufficient cooling time for the passions of an average and reasonable man to abate. Deferring for the moment consideration of the inadequacy of the cause, the cause of the appellant's distress was jealousy. Eleven-year-old Derak Wilson testified that the appellant had argued with Hazel Wilson over the fact that "she go out and get drinks" and that "she be talking to somebody else" regularly over an unspecified but significant period of time. The neighboring minister had overheard quarrels between the appellant and Hazel Wilson over a period measured at least in weeks, if not over the course of the several months that they had been living on Guilford Avenue. A major flare-up of this domestic unrest had occurred at least one week before the killings. The situation had so deteriorated that Hazel Wilson moved out at least four days before the killings. We conclude that the evidence in this regard shows clearly and decisively that there was sufficient cooling time for the average and reasonable man to have his passions abate. The law in this respect was well stated in LaFave and Scott, *Criminal Law*, at 579:

"Assuming that the victim's conduct actually provokes, and reasonably provokes, the defendant into a passion which robs him of his normal capacity for self-control, there still remains a problem of reasonable time for the passion to subside whenever there is a time lag between provocation and infliction of the fatal wound. By the majority view, a provoked defendant cannot have his homicide reduced to voluntary

manslaughter where the time elapsing between the provocation and the death blow is such that a reasonable man thus provoked would have cooled; and this is so even though the defendant, being slower to cool off than the ordinary person, has not in fact cooled off by the time he delivers the lethal blow."

Perkins, *Criminal Law* (Second Ed., 1969), spoke to the same principle of law, at 67:

"This, like the adequacy of the provocation itself, is measured by an objective test. Whether or not there was a reasonable opportunity for the passion to cool, depends upon whether or not, under all the circumstances of the particular case, there has been such a lapse of time since the provocation was received that the mind of the ordinary reasonable man would have cooled sufficiently so that action once more would be directed by reason rather than by passion. If such time has elapsed before the fatal act the slayer does not have the benefit of the rule of provocation even if his own mind is still inflamed by passion at the time of the killing. He is guilty of murder in such a case."

We were dealing with this very question when we held that a jury instruction on the subject of manslaughter was not required in *Bartram v. State, supra.* There, the act of provocation was legally adequate beyond dispute: the outraged wife literally observed her husband in an act of adultery before her very eyes. There, the provoking act was rather clearly the effective cause of the killing. The fatal flaw, however, for purposes of invoking the law of provocation in that case, was the lapse of time involved between cause and effect. The law, in its wisdom, extenuates certain killings by lowering the degree of blameworthiness because it recognizes human frailty when one is in the clutches of blind and sudden fury. The long-smoldering grudge, by way of contrast, may be psychologically just as compelling a force as the sudden impulse but it, unlike the

impulse, is a telltale characteristic of premeditation. The law extenuates certain killings not simply because they have been provoked but because there has also been the lack of time between the provoking cause and the impulsive response to think about the consequences or the alternatives. In the case of the spontaneous explosion, reason has no opportunity to intervene; in the case of the "slow burn," it has. We demand that it intervene whenever it can. In *Bartram v. State, supra,* we said, at 33 Md. App. 175-176:

> "It is hornbook law that if one spouse discovers another in an unexpected act of adultery, a killing of spouse or paramour in hot-blooded fury may lower the blameworthiness from the murder level to the manslaughter level.
>
> ... By an objective standard, moreover, the time frame must be close enough so that an average and reasonable man would not have had an adequate 'cooling period' for the first fury to abate. ...
>
> ... [I]n terms of the legal adequacy of the provocation, the discovery of adultery must be sudden and unexpected. ...
>
> . . .
>
> The law recognizes the human frailty of sudden fury. For the long-suffering spouse, the way out of the unbearable predicament must be the divorce court and not a bullet."

Even in the face of blazing jealousy, what is demanded of a spouse is, *a fortiori,* demanded of one who is not a spouse.

The absolutely foreclosing aspect, as we consider the availability of the defense of provocation, is our evaluation of the first essential element of that defense:

> "(1) There must have been adequate provocation."

The appellant sets himself a difficult task in arguing now that the killing was the result of hot-blooded provocation; his trial position was that he was not the criminal agent at all, provoked or unprovoked. We are asked to speculate as to both the provoking act and the resultant state of

provocation. We will, nevertheless, give the appellant the benefit in this regard of any inferences that may reasonably be drawn from the evidence.

We begin with the proposition that there must be not simply provocation in psychological fact, but one of certain fairly well-defined classes of provocation recognized as being adequate as a matter of law. Clark and Marshall, *Law of Crimes* (Sixth Wingersky Ed., 1958), describes the objective character of this test, at 621:

> "To reduce a homicide from murder to manslaughter, *the provocation must be adequate in law,* and to be so it must be so great as reasonably to excite passion and heat of blood. Passion without adequate provocation is not enough. If a man unreasonably allows his passion to control his judgment, he is responsible to the full extent for the consequences of his acts. The line which distinguishes provocations which will mitigate the offense from those which will not, cannot be clearly defined. Reasonableness is the test. The law contemplates the case of a reasonable man — an ordinarily reasonable man — and requires that the provocation shall be such as might naturally induce such a man, in the anger of the moment, to commit the deed." (Emphasis supplied)

40 Am.Jur.2d, *Homicide,* § 61, "Adequacy or reasonableness of provocation," states, at 354:

> "Passion on the part of the slayer, no matter how violent, will not relieve him from liability for murder unless it was engendered by *a provocation which the law recognizes as being reasonable and adequate.*" (Emphasis supplied)

The most that emerges from the scant and ambiguous evidence is a state of mind in the appellant of diffuse and undifferentiated jealousy. Derak Wilson, the victim's 11-year-old son, under examination by the appellant's

attorney, could give, at most, the following explanation for the appellant's state of mind:

"Q. Which is it; she would go drinking first or drinking afterwards?
A. Then — go drinking first.
Q. Then they would have the arguments?
A. Uh huh. Because when she go out and get drinks, then sometimes I think she be talking to somebody else."

Neither "going out and getting drinks" nor "talking to somebody else" remotely constitutes an act of legally recognized provocation. To begin with, they are acts of lawful behavior which, as Perkins *Criminal Law* (Second Ed., 1969), points out, at 54, do not ordinarily* serve as triggers for legally sufficient provocation:

"[T]he provocation is itself an *unlawful* act of another, since a lawful act, even if it involves physical violence, is not recognized by law as a mitigating circumstance."

The same holds true with respect to Hazel Wilson's act of moving out of the upstairs apartment, where she cohabited with the appellant, and into her mother's apartment on the first floor of the same house. It is not unlawful to move out under any circumstances; even more so, it is not unlawful to move out to escape the appellant's fits of excessive jealousy and his physical beatings.

Nor does the third and final possible source of the appellant's passion constitute legally recognized provocation. This source was suggested by the testimony of the neighboring minister:

"I said, 'Man, you seem to be an intelligent man. What is going on? Why you all fighting and carrying on that way? Well . . .' He said to me —

---

* The hesitation to state the proposition in absolute terms is ours and not that of Professor Perkins.

tried to tell me something about her other husband, you know. Said that — this Hazel was getting some money from her first husband, and what have you. She will go by there and get it every weekend. I think that was the problem — that he was accusing her of her first husband."

For all which the evidence in this case reveals, Hazel Wilson's "other husband" was still her legal and, therefore, only husband.

Of the recognized varieties of action which constitute legally adequate provocation, the only one remotely suggested by the circumstances in this case is that of discovering a spouse in an act of adultery. As a necessary precondition for this type of provocation, there must be, at the very least, some significant sexual contact, if not literally intercourse itself. The law anciently required a spouse unexpectedly to discover the erring spouse *in flagrante delicto*. In its more modern and liberalized manifestations, it has been extended to situations where the spouse has suddenly been told of the other spouse's infidelity or has strong reason to believe that there has been such infidelity. Even in the liberalized forms, however, the indispensable predicate is sexual intercourse. LaFave and Scott, *Criminal Law* (1972), discussed the question at 575-576:

"It is the law practically everywhere that a husband who discovers his wife in the act of committing adultery is reasonably provoked, so that when, in his passion, he intentionally kills either his wife or her lover (or both), his crime is voluntary manslaughter rather than murder. So too a wife may be reasonably provoked into a heat of passion upon finding her husband in the act of adultery with another woman. The modern tendency is to extend the rule of mitigation beyond the narrow situation where one spouse actually catches the other in the act of committing adultery. Thus it has been held that a reasonable though

> erroneous belief on the part of the husband that his wife is committing adultery will do. Some cases have held that a reasonable man may be provoked upon suddenly being told of his wife's infidelity."

One cannot, as the appellant here apparently seeks to do, take a law which speaks exclusively of the unexpected discovery of one's legal spouse in an act of adultery and extrapolate from that a more general principle dealing with any act by any object of one's affection which gives rise to a state of jealousy.

Even more foreclosing than the innocuous nature of the acts, however, is the legally uncountenanced status of the actors. Even where the provocative act is the direct, unexpected and visual discovery of sexual intercourse in progress, the defense is still only available to the "cuckold" who is a lawful spouse. LaFave and Scott, *Criminal Law*, speaks to this very point, at 576:

> "The rule of mitigation does not, however, extend beyond the marital relationship so as to include engaged persons, divorced couples and unmarried lovers — as where a man is enraged at the discovery of his mistress in the sexual embrace of another man."

*Rex v. Palmer*, [1913] 2 K. B. 29 (defense not available where defendant discovered fiancée in an act of intercourse with another); *Rex v. Greening*, [1913] 3 K. B. 846, 23 Cox Crim. Cas. 601 (defense not available where defendant and unfaithful companion had been living together as man and wife); *People v. Pecora*, 107 Ill.App.2d 283, 246 N.E.2d 865 (1969) (defendant's ex-wife told him she had been intimate with other men: held, not adequate provocation even if he "had not psychologically disengaged himself from the marital relationship since the divorce"); *People v. McDonald*, 63 Ill.App.2d 475, 212 N.E.2d 299 (1965) (where defendant had lived with the woman he killed for some 25 years, the court ruled it would not apply the "exculpatory features of *crime passionel* to the killing of a mistress, regardless of the duration of the relationship").

Each of the four elements is a *sine qua non* for a defense of mitigation based upon hot-blooded response to legally adequate provocation. The evidence was palpably insufficient with respect to at least three of the elements, all of which would be necessary to generate a genuine jury issue. As we said in *Lang v. State*, 6 Md. App. 128, 131, 250 A. 2d 276:

> "Thus, in order for instruction regarding heat of passion to be required, evidence must be introduced from which the jury could have found each of the above mentioned elements."

Since manslaughter is not a regular way station upon the evidentiary thoroughfare, but is rather a series of various and peculiar cul-de-sacs into which courtroom attention is only diverted by legally sufficient road signs pointing the fact finder specifically back into one or another of those particular byways, the main route upward does not ordinarily flow through manslaughter law but bypasses it.[1] Only when the defensive evidence has necessitated one of these side excursions in the first instance, does the State assume its due process burden of negotiating its way through the diversion of manslaughter beyond a reasonable doubt.[2] In this case, no such detour was indicated by the

1. A Thayer-Wigmore presumption is classically a bypass. One has to slow down and go through the "business district" only when there is some legally sufficient reason to do so.

2. This is completely consistent with the constitutional mandate according to *Mullaney v. Wilbur*, 421 U. S. 684, 95 S. Ct. 1881, 44 L.Ed.2d 508 (1975), and *In Re Winship*, 397 U. S. 358, 90 S. Ct. 1068, 25 L.Ed.2d 368 (1970), as interpreted by *Evans v. State*, 28 Md. App. 640, 349 A. 2d 300 (1975). In order to reach the murder plateau, the State must establish that matrix of elements, all of which hover under the misbegotten "umbrella term" of malice. Those elements are 1) the intent to kill (express or implied), 2) the absence of justification or excuse (which raises the homicide from the non-criminal to the criminal level in the first place), and 3) the absence of mitigation (which establishes the crime at the murder level as opposed to a lesser manslaughter level).

The State sometimes proves the intent to kill directly and sometimes by the permitted inference of that intent which arises from the pointing of a deadly weapon at a vital part of the human anatomy. The presumptions (in the appropriately limited Thayer-Wigmore tradition of shifting only the burden of producing evidence) of non-justification, non-excuse and non-mitigation, unless and until dissipated, serve as proof (or as some commentators prefer to say, "as a substitute for proof") of those negative elements of non-justification, non-excuse and non-mitigation, respectively. The constitutional propriety of the undissipated presumption serving as

evidence. Under the circumstances, Judge Levin had no more cause to expound upon the law of manslaughter [3] than to expound upon the Rule in Shelley's Case.

### Restriction on Appellant's Attorney

The next three contentions involve the presentation of the evidence bearing on the question of the appellant's sanity at the time of the crime. The first deals with the court's determination that appellant's attorney could not point to the appellant and comment before the jury upon the appellant's condition there in the courtroom. The issue initially arose just prior to the opening statements to the jury. Although the precise extent of the restriction is somewhat ambiguous, it appears that the restriction dealt with the range of permissible comment in addressing the jury. The court said:

> "Now, the State has moved for appropriate relief, and one is to restrain Mr. Yankellow from any mention of the fact or any statement dealing with the present condition of the defendant. I have heard from the defense on this, and had a chance to think about this over the weekend.
>
> Since the defense · of insanity relates to the condition of the defendant at the time of the alleged commission of the crimes, then it is immaterial what happened subsequent thereto. Consequently, I

---

such proof was made quite clear in *Mullaney v. Wilbur, supra,* at 421 U. S. 701-702, and by *Evans v. State, supra,* at 28 Md. App. 722-730.

Only when a defendant has generated a genuine jury issue with respect to one or more of these questions does the State assume its due process burden of proving those negative elements beyond a reasonable doubt. This is the only command of *Winship* and *Mullaney v. Wilbur* — that once the issue is legitimately in the case, the risk of non-persuasion is upon the State and not upon the defendant. For a discussion of the ways in which the State may sometimes prove those negative elements, see *Gilbert v. State,* 36 Md. App. 196, 373 A. 2d 311 (1977).

3. Indeed, one might ask, "Which law of manslaughter?" for there is no single law of manslaughter; there are rather a dozen laws of manslaughter. So too, there are at least half a dozen laws of justification and half a dozen laws of excuse. It is not only constitutionally permissible but judicially necessary to require that a defendant indicate, by producing legally sufficient evidence to generate a jury question, which body of law out of several dozen possible bodies of law is material in a particular case.

think the State is correct, and that Mr. Yankellow may not tell the jury, in any form, words to the effect that — well, members of the jury, you see how he is now. That corroborates the fact of our contention that he was insane at the time of the alleged murders.

The matter of competence as opposed to sanity is a problem and the responsibility of the Judge rather than the jury. So, if at any time it appears to me that the defendant is not competent to stand trial, we will recess the trial. But the observations by the jury of the defendant's present condition during this trial must not be alluded to, vis-a-vis, the issue of sanity or responsibility at the time of the alleged commission of the crimes."

It is difficult to discern how sweeping the prohibition may have been. We do note that the trial consumed nine court days stretched out over 20 calendar days and that the only objection lodged by the appellant was prior to the opening statement. Neither from the transcript nor from appellate argument do we gather that the appellant felt he was denied the opportunity to comment upon the evidence in closing argument. Certainly nothing was done to indicate that he felt handicapped by some restriction at that stage of the case. No question was raised; no objection was made.

To the extent to which appellant's counsel could not direct the jury's attention to appellant's counsel's observations of the appellant, we think the restriction was perfectly proper. It is not the office of the opening statement to give evidence in whatever form.

In fair context, we read the court's directions to counsel to be a statement that counsel is not qualified to render an expert opinion on the appellant's mental status. The appellant does not couch his argument in terms of fair comment to the jury, at the close of the entire case, on what the evidence in the case may have been. He rather urges that his counsel should have been permitted, during opening argument or during the trial proper, to play the role of a

cicerone, leading the jury on a guided tour of the appellant's psyche, pointing, directing observations and making interpretive commentary as he went. We agree with Judge Levin that not only is there a question of strained relevance between the courtroom appearance and the condition almost a year and a half earlier but further that what the appellant sought would have constituted, in effect, the giving of expert testimony by appellant's counsel:

> "I submit to the Court that the evidence of Mr. Tripp, as he now sits and as he sits through the course of this trial is evidence before the jury. And that I have a right to bring that to the jury's attention.
>
> THE COURT: ... I agree with you up to a point. I agree with you that as to testimony of a doctor or a psychiatrist, that is to say, a medical person, obviously he may testify to the jury facts that he observed, observations of the defendant himself; their diagnosis, prognosis relating to sanity or responsibility at the time of the alleged commission of the crimes. However, an attorney saying things to a jury, that does not constitute evidence. . . . [C]onsequently, no one, including the State's Attorney, can argue to the jury things medically that happened in this courtroom today. . . . I am restricting you as an attorney from your pointing to the physical condition of the defendant in the courtroom to persuade the jury that confirms the evidence of your expert."

Appellant's counsel never proffered to the court what his comments would be. We note that the appellant did take the stand and testify. In the presence of the jury, he was unresponsive, illogical and rambling. The jury was in a position to notice this and there is no indication that appellant's counsel was in any way inhibited from commenting, in closing argument, upon the actual testimony of the appellant. To the extent to which appellant's counsel was not permitted to offer his own observations and

impressions, the law is clear that he did not possess the medical expertise to offer an opinion predicated on reasonable medical certainty. *Millard v. State,* 8 Md. App. 419, 261 A. 2d 227; *Greenleaf v. State,* 7 Md. App. 575, 256 A. 2d 552. We read counsel's request and the court's response in just such a light:

> "And you're saying that I cannot make any remarks to the jury about my interpretation of Mr. Tripp's condition, and give such remarks.
>
> Now, the jury is not bound by what I say. But I certainly should have a right to argue to the jury what I truly believe.
>
> . . .
>
> THE COURT: . . . You may argue to the jury your interpretation of medical testimony. However, you will concede that a psychologist, even, may not give his opinion as to sanity. And if a psychologist can't, because the Courts have said that the question of sanity is a medical question, then surely an attorney may not tell the jury — look at this man now, in February, 1976, members of the jury, don't you feel that that confirms what our doctors have said.
>
> So, I do restrict you only, sir, as an attorney from alluding to the defendant's present condition in this Court, his appearance, his demeanor, his conversation, his lack of conversation, his attitude; that you may not argue to the jury presently as constituting sanity at that time."

On the admissibility of evidence, the law vests great discretion in the trial judge who is responsible for the conduct of the trial. The exercise of that discretion will not be reversed absent a showing of clear abuse. We perceive no abuse in this case.

### The Videotaped Interview under Sodium Brevitol

In the course of the mental examination of the appellant, the Medical Services Officer requested an order that a

sodium brevitol test be administered. This is one of the so-called "truth serum" drugs. The test was administered by a Dr. Robey, an expert in the field from Michigan, and was observed by Dr. Rappaport, who ultimately testified for the State, and by Dr. Pankey, who ultimately testified for the appellant. A videotape of some four hours in length was made of the sodium brevitol interview and a shortened one-half hour tape was made from the full-length version.

During their testimony on the issue of sanity, the psychiatric experts were permitted to refer to the test as one of the bases for their opinions. Dr. Rappaport at several times referred to specific questions and answers that had significance for him. These specific references were unobjected to at the time they came into evidence. Maryland Rule 1085.

The basis of the present contention is the appellant's chagrin at not being permitted to play the videotape of the sodium brevitol interview before the jury. Judge Levin rendered a lengthy opinion giving his reasons for not permitting this to be done. He had reviewed the tape himself and concluded that it was potentially confusing to the jury. As to its inflammatory potential, he commented as follows:

> "And finally, there is one last thing on my mind, and that is the spectacle of the doctor interviewer asking questions of the defendant, and the defendant was giving answers that were, to me anyway, unexpected to the interviewer. And as he kept getting these unexpected responses, he pumped in more brevitol into the body of the defendant. And he kept up to a point where the interviewer finally stopped the injections. And it was making me uncomfortable, frankly, to see the brevitol administered to the man. And if I am a cynical person, sitting up here on the bench witnessing all kinds of cases every day, I am not so sure of the impact — despite what Mr. Yankellow says — I am not so sure of the impact, emotionally, upon a jury. That is to say, it would have a

tendency to run away as far as they are concerned due to the reaction it might produce as against the totality of the testimony dealing with sanity."

Judge Levin noted further the strong possibility that the jury would be misled into considering certain answers, given under the influence of the drug, upon the merits of the case and not as the basis for an expert psychiatric opinion. He cited the lack of consensus as to the reliability of the test and referred to the ability of one taking the test still to dissemble in his own interest. He made the very pertinent observation that the appellant did not seek to offer the electroencephalogram or the results of the neurological examination for the jury's perusal. He noted that the sodium brevitol interview was just as esoteric a body of data in terms of forming the predicate for an expert opinion, but had, unlike the other two tests, a potential to mislead in case the self-serving declarations of the appellant, made during the interview, were given weight upon the merits of the case, where they had no business intruding. We conclude that Judge Levin carefully examined the applicable law and meticulously weighed in the balance the pros and cons of the proffered evidence. Again, we perceive no abuse of that discretion which the law entrusts to the man who must control the course of the trial.

### The Observations of the
### Jail Guard

The appellant now claims that certain observations made of him by a jail guard constituted a violation of his Fourth Amendment rights while in the institution. Although we perceive no remote merit in the contention,[4] the short answer is that this point was not decided below and has not been preserved for appellate review. Maryland Rule 1085. The only objection to the testimony of the jail guard at trial was based upon the specific ground that it was irrelevant. That point has not been pressed upon appeal.[5] The present

---

4. We note, in passing, that the notion that an Englishman's home is his castle has never been held to apply to an inmate of the castle dungeon.

5. Furthermore, we have read the testimony and it was highly relevant.

contention, involving a strained construction of the Fourth Amendment, was not remotely alluded to at trial.

### The Jury Instruction on the Jury's
### Non-concern with Punishment

Judge Levin made the following comment to the jury on the subject of punishment:

> "In the event that you do find the defendant guilty of any of the crimes, the matter of punishment or penalty is not the responsibility of the jury . . . Your job will be done after finding the defendant guilty or not guilty, sane or insane . . . If you do find him guilty, the responsibility of punishment is upon this Court . . ."

The appellant, for transparent tactical reasons, wanted the jury to be assured that if they found the appellant not guilty by reason of insanity, the judge could still order him confined for further mental examination. The law, however, is clear that a jury is not in the business of rendering ultimate judgment but only in the business of resolving disputed facts and, therefore, should have no concern as to the consequences of its factfinding. *Tull v. State*, 230 Md. 152, 186 A. 2d 205. It is not appropriate for the State to seek a tactical advantage by indicating, in certain cases, that a defendant may receive probation or a suspended sentence if the jury brings in a proper verdict of guilty in a case where it might be reluctant to do so because of the fear of inordinate punishment. Conversely, it is not appropriate for a defendant to seek a tactical advantage by indicating, in other cases (such as this one), that a defendant may still be confined and will not be "loose upon the streets" if the jury brings in a verdict of not guilty by reason of insanity. Either effort in either direction distracts the jury from the purity of its mission and is always to be discouraged.

*Judgments affirmed; costs to be paid by appellant.*