661 A.2d 175

**John David DENNIS**

v.

**STATE of Maryland**

**No. 1774, Sept. Term, 1994.**

Court of Special Appeals of Maryland.

July 5, 1995.

Nancy M. Cohen, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief) Baltimore, for appellant.

Diane E. Keller, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Sandra A. O'Connor, State's Atty. for Baltimore County, Towson, on the brief), for appellee.

Argued before WILNER, C.J., MURPHY, J., and JOHN J. GARRITY, Judge (retired) Specially Assigned.

WILNER, Chief Judge.

On the evening of August 21, 1993, appellant, armed with a handgun, went to the home of Mark Bantz, apparently kicked in the door, entered the house, and shot Mr. Bantz nine times—in the chest, in the head, and in the back. At least three of the wounds were fatal.

As a consequence of this conduct, a jury in the Circuit Court for Baltimore County convicted appellant of premeditated first degree murder, burglary, and unlawful use of a handgun, for which substantial sentences were imposed. Appellant complains in this appeal that the court refused to instruct the jury

properly on the crime of manslaughter and that it erred in allowing into evidence, as excited utterances, certain statements made at the scene of the crime by his wife, Robin. We find no merit in these complaints and shall therefore affirm the judgments entered by the circuit court.

## FACTUAL BACKGROUND

Although appellant claimed to have no memory of the actual killing, his defense was that it must have occurred in the heat of passion, as the result of a dual, or mixed, provocation—Robin's two-month adulterous relationship with Bantz, culminating in the sight of seeing them in an amorous embrace; and knowledge gained earlier in the day that, on the previous evening, Bantz had smoked cocaine in the presence of appellant's 12–year–old son.

Appellant and Robin met while they were teenagers; they began to live together and married when Robin became pregnant. Appellant worked hard to support his family, and all, apparently, went well until late 1990 or early 1991, when they began to suffer financial difficulties due, according to appellant, to Robin's spending habits. In July, 1993, he and Robin declared bankruptcy.

Meanwhile, on June 26, 1993, Robin left the marital home, telling appellant that she was going to live with a female friend. About a week later, Robin confessed that she was, in fact, living with Mr. Bantz. Appellant became "emotionally upset" at this news, at least in part because he knew that Bantz was "involved with drugs." This concern heightened when he learned, in mid-July, that Robin too had begun smoking cocaine. She rejected his pleas to come home, "because of the drugs and the sex." Appellant then made two threats against Bantz—one in a conversation with Bantz's parents and one in a letter he wrote to Robin.

By late July or early August, appellant began to accept the situation. Although still professing strong feelings for Robin, he said that he "was starting to learn to accept the fact that she wasn't going to come home" and to focus his attention on

raising his son. By August, he continued, "I was doing fairly good with all of this. I was pretty much coming back to earth." On Tuesday, August 17, however, Robin told appellant that she wanted to return. The next day, appellant picked her up from work, took her to Bantz's house to get some of her belongings, and had dinner and spent the night with her.

Notwithstanding this romantic interlude and the representation that her affair with Bantz was over, Robin asked for a little more time to make up her mind. She said that Bantz had moved back with his parents and allowed her to remain in the home they had shared until she could decide what she wanted to do. It is not clear whether appellant and Robin had contact the next day, but on Thursday, August 19, they again spent the evening together. On Friday evening, at Robin's request, appellant allowed his son to stay with Robin. When appellant took his son to the house, Bantz was not there.

On Saturday, appellant learned from his son that Bantz had come to the house on Friday evening, and that, as they were watching television, Bantz smoked cocaine. Appellant decided to investigate. He tried to reach Robin by telephone, but, when there was no answer, he drove to Bantz's house. He had with him in the car a .22 caliber handgun, allegedly because of a hunting trip planned for the next day.[1] Appellant stopped on the way and called Robin again, this time getting through to her; stating that she was going out with a girlfriend, she asked him to stay away, but he told her he was coming.

When he arrived at the home, appellant saw Bantz's father's truck, thereby indicating Bantz's presence. He approached the house, opened the screen door, and looked through the window. He described in his testimony what he saw:

---

1. In fact, a hunting trip, as such, was not planned. Hunting was not allowed in August. Testimony by appellant's friend, who was to accompany him, indicated that they were intending to "scout out" areas for a future hunting trip, and that appellant was bringing his pistol for "[s]nakes or wild dogs."

"I seen [Bantz] standing there, and he had his hands around my wife, and they were kind of, like embraced in, I don't know, some kind of mood, I guess.

He had her dress all hiked up around her. I could see her, you know. It was kind of hard to take.

\* \* \* \* \* \*

She was—it was, like, her back and .[Bantz's] belly. He had her kind of around in front of him, and the best way I can say it, he had her all hooked up.

\* \* \* \* \* \*

He had her dress kind of hiked up around her and it just looked like he was maybe feeling her private parts or so.

\* \* \* \* \* \*

It looked like they were getting ready to engage in some kind of sex act."

Appellant claimed to have no memory of what next occurred, and, because he and Robin reconciled, she refused to testify. Testimony from two police officers who responded to the scene in response to emergency calls from Robin indicate that the front door had been kicked in and that the nine bullets fired into Bantz's head and body had been fired from at least 18 inches away; they were not contact wounds.

Officer Wiley stated that he was the first to arrive, that Robin met him at the door, that she was "very upset, crying, screaming, almost to the point of where she was hysterical," and that Bantz was lying on the kitchen floor, dead. Over objection, Wiley testified that Robin told him that, after receiving appellant's call, she and Bantz were concerned that he would be "in a violent-type state," and that they were trying to get their things together and get out of the house before he arrived. Wiley said that Robin was on the telephone with Bantz's parents when he arrived. Mr. Bantz's father testified that Robin had called, that she was extremely upset, and that she told him that appellant had "just shot" Bantz.

## MANSLAUGHTER INSTRUCTIONS

When counsel and the court first conferred on jury instructions, the court indicated that it proposed to give the Pattern Jury Instruction on voluntary manslaughter drafted by the Maryland State Bar Association Committee on Criminal Pattern Jury Instructions (MPJI–Cr 4:17.4C). In pertinent part, that instruction states that a killing in hot blooded response to "legally adequate provocation" is a mitigating circumstance, that in order for such a mitigating circumstance to exist in the particular case, five factors must be present: (1) the defendant reacted to something in "a hot blooded rage"; (2) the rage was caused by something "the law recognizes as legally adequate provocation" and that the only act the jury could find to be adequate provocation under the evidence in this case is "the sudden discovery of the defendant's spouse in an act of sexual intercourse"; (3) the defendant was still enraged when he killed the victim; (4) there was not enough time between the provocation and the killing for a reasonable person's rage to cool; and (5) the victim was the person who provoked the rage.

Appellant raised no objection then, and raises no complaint now, about any aspect of that proposed instruction other than the language in element (2) declaring that the only adequate provocation under the facts of this case would be if appellant suddenly discovered Robin "in an act of sexual intercourse." Initially, counsel complained that the instruction suggested that appellant must have discovered Robin in the actual act of intercourse and asked that the instruction be broadened to include that the defendant have simply learned of the intercourse or have strong reason to believe it took place. The court's first response was to suggest changing "intercourse" to "intimacy," but, upon the State's objection, the court reconsidered and agreed to modify the instruction in the limited manner requested, to read "sudden discovery by the Defendant of the Defendant's spouse in the act of sexual intercourse or his having strong reason to believe that it recently took place." It gave the instruction in that form.

Upon completion of the instructions, defense counsel asked for a further expansion of the manslaughter instruction. Citing *Girouard v. State*, 321 Md. 532, 583 A.2d 718 (1991), he posited that

> "the total circumstances surrounding the murder, the killing, is something that is important to be considered in this case, particularly because one element seemingly left out of the Court's instructions is the consideration of drug usage, the exposure of the wife to drugs and the exposure of the son to drugs and the wife using drugs and the Defendant's knowledge of drugs being fed to his wife might have had on his actions. That, taken along with the adultery, would be more motivation than might occur with just adultery itself. . . . "

The court declined to supplement its instruction.

After some period of deliberation, the jury sent a note asking the court to "clarify the term recent in the description of legal provocation in terms of recently had sexual intercourse, and must it be intercourse?" That provoked another discussion between counsel and the court, principally over the second aspect of the question. Defense counsel at one point argued that the proper instruction would be simply to "look to the circumstances surrounding the homicide and try to discover if it was provoked by the victim" and that "any facts, which the jury deems could meet that provocation or make that provocation, as otherwise set out in the instructions of the Court, can be considered by the jury."

The court rejected that approach, which counsel more or less conceded went beyond the current Maryland case law, and, instead, instructed the jury that "[r]ecent is a term which is imprecise, and its meaning is within your sound discretion" and "intercourse is to be interpreted as having its usual and generally accepted meaning."

In this appeal, appellant complains that the court erred in limiting the provocation to the discovery of actual sexual

intercourse, i.e., coition.[2] He urges that (1) the conduct observed by him "was sufficient to constitute an 'act of sexual intercourse' necessary to form legally adequate provocation for the killing," (2) even if it was not, the law should recognize "significant sexual contact" or "sexual intimacy" as sufficient provocation, and (3) in any event, the jury should have been instructed to consider "the victim's illicit drug use in the presence of appellant's child" as sufficient provocation.

 To constitute a mitigating factor sufficient to negate the element of malice, and thereby reduce murder to manslaughter, the provocation must be "adequate." In *Girouard, supra,* 321 Md. at 539, 583 A.2d 718, the Court explained that, for a provocation to be "adequate," it must be "calculated to inflame the passion of a *reasonable* [person] and tend to cause [that person] to act for the moment from passion rather than reason." (Emphasis added.) That describes one aspect of "adequacy." There is another, which flows from the requirement that the passion be that of a reasonable person; the provocation must be one the law is prepared to recognize as minimally sufficient, in proper circumstances, to overcome the restraint normally expected from reasonable persons. There are many "slings and arrows of outrageous fortune" that people either must tolerate or find an alternative way, other than homicide, to redress.

Judge Moylan commented on this in *Tripp v. State,* 36 Md.App. 459, 473, 374 A.2d 384 (1977):

"We begin with the proposition that there must be not simply provocation in psychological fact, but one of certain fairly-well defined classes of provocation recognized as being adequate as a matter of law. Clark and Marshall, *Law of Crimes* (Sixth Wingersky Ed.1958), describes the objective character of this test at 621:

---

**2.** It is not at all clear that the court, in fact, limited its definition of sexual intercourse to actual coition. The jury, as noted, was told simply to give the term its "usual and generally understood meaning." For purposes of this appeal, however, we shall assume that the restrictive meaning objected to by appellant was the one conveyed.

'To reduce a homicide from murder to manslaughter, *the provocation must be adequate in law,* and to be so it must be so great as reasonably to excite passion and heat of blood. Passion without adequate provocation is not enough. If a man unreasonably allows his passion to control his judgment, he is responsible to the full extent for the consequences of his acts. The line which distinguishes provocations which will mitigate the offense from those which will not, cannot be clearly defined. Reasonableness is the test. The law contemplates the case of a reasonable man—an ordinary reasonable man—and requires that the provocation shall be such as might naturally induce such a man, in the anger of the moment, to commit the deed.' "

(Emphasis added by the *Tripp* Court.)

We are not dealing here with the entire universe of situations that might have the required effect. One type of conduct that the common law has long and consistently recognized as legally adequate is observing one's spouse in an act of adultery. The *Girouard* Court confirmed that "discovering one's spouse in the act of sexual intercourse with another" constitutes sufficient provocation.[3] 321 Md. at 538, 583 A.2d

---

3. At a more ancient time, it appears that the killing of a man caught in the act of adultery with the defendant's wife was regarded as entirely justifiable. Blackstone notes in his discussion of the crime of manslaughter that

"if a man takes another in the act of adultery with his wife and kills him directly on the spot, though this was allowed by the laws of Solon, as likewise by the Roman civil law, (if the adulterer was found in the husband's own house,) and also among the ancient Goths, yet in England it is not absolutely ranked in the class of justifiable homicide ... but it is manslaughter. It is, however, the lowest degree of it; and therefore in such a case the court directed the burning in the hand to be gently inflicted, because there could not be a greater provocation."

W. Blackstone, *Commentaries on the Laws of England,* Book IV * 191–92 (Lewis ed., 1922) (footnotes omitted).

As Judge Moylan noted in *Tripp,* we have advanced somewhat in the past 200 years. Even in Blackstone's time, however, and certainly today, it is important to keep in mind that adequate provocation is but one of several elements that needs to be established in order to negate

718. In *Tripp, supra,* 36 Md.App. at 475, 374 A.2d 384, we allowed a modest expansion. We there observed:

> "The law anciently required a spouse unexpectedly to discover the erring spouse *in flagrante delicto.* In its more modern and liberalized manifestations, it has been extended to situations where the spouse has suddenly been told of the other spouse's infidelity or has strong reason to believe that there has been such infidelity. *Even in the liberalized forms, however, the indispensable predicate is sexual intercourse."*

(Emphasis added.)

In his quest for a more dramatic extension, appellant urges that "sexual intercourse," if confined in meaning to coition, is too narrow and that other forms of observed, inappropriate sexual behavior on the part of one's spouse also should suffice. He seeks succor for this position from a single sentence, taken out of context, in *Tripp, supra,* 36 Md.App. at 475, 374 A.2d 384. We said there:

> "Of the recognized varieties of action which constitute legally adequate provocation, the only one remotely suggested by the circumstances in this case is that of discovering a spouse in an act of adultery. *As a necessary precondition for this type of provocation, there must be, at the very least, some significant sexual contact, if not literally intercourse itself."*

(Emphasis added.)

Immediately following that passage is the recognition that, while the law traditionally required the defendant actually to witness an act of illicit intercourse, it would suffice if the defendant had just learned that it had occurred. As noted in an earlier quotation from *Tripp,* Judge Moylan made clear

---

malice and reduce murder to manslaughter. Catching one's spouse in an act of adultery—and indeed any other conduct regarded as adequate provocation—does *not,* of itself, suffice. As the pattern jury instruction indicates, and as the *Girouard* Court made clear, the killing must have been in the sudden heat of passion caused by the provocation, i.e., followed the provocation before there had been a reasonable opportunity for the passion to cool.

that, even in this liberalized extension, "the indispensable predicate is sexual intercourse."

The language seized upon by appellant was not intended to create a new standard. In its proper context, it means no more than that the defendant need not observe the spouse actually engaging in copulation if the evidence leads him or her reasonably to believe ·that it has recently occurred.

We need not determine here whether the term "sexual intercourse" might properly include *any* conduct other than coition. It is enough for us to reject the proposition that mere "sexual intimacy" or "significant sexual contact"—the standard urged by appellant—suffices. Those terms are much too general and cover far too great a range of conduct to be legally acceptable. It is clear that the kind of conduct allegedly observed by appellant as he peered through the window does not fall within any reasonable definition of "sexual intercourse."

Appellant's alternative assertion is that legally adequate provocation can be fashioned from the combination of Robin's earlier adultery, Bantz's corruption of her and appellant's son with drugs, and the suggestive embrace that he actually witnessed. That argument, though couched in terms of expanding the concept of adequate provocation, more significantly implicates, and fails to satisfy, the required causation between the provocation, the passion, and the killing.

By his own testimony, any passion generated by the knowledge that Robin had been engaged in an adulterous affair had cooled long before appellant appeared at Bantz's house. He had, in effect, forgiven Robin for her past infidelity and agreed to resume the marital relationship. Nor can provocation be found from the revelation of Bantz's drug use on Friday evening. For one thing, although appellant testified that he "didn't like it," he offered no evidence that he was, in any way, enraged by that revelation. He said that, after learning of the incident, he tried to call Robin and, when there was no answer, "I figured I just would ride up there." That is hardly an indication of hot blood.

It is clear from the evidence that appellant did not go to Bantz's home either in response to the earlier adultery or to confront Bantz over his drug use in the son's presence. He went, he said, "to go get my wife, and she had to get out of there."

These incidents, then, did not generate the passion that, according to appellant, led to the killing.

What appellant seeks to do is to combine three separate grievances, arising or occurring at different times, none of which individually can constitute legally adequate provocation as of the time appellant actually shot Bantz, and make the combination suffice as provocation. A few States, notably California and Pennsylvania, have apparently found sufficient provocation from what appears to be "the last straw" theory— a smoldering resentment or pent-up rage resulting from earlier insults or humiliating events culminating in a triggering event that, by itself, might be insufficient. Maryland has not adopted that view; nor, apparently, have most other States. In *Tripp*, we rejected the "long smoldering grudge" or "slow burn" as adequate. 36 Md.App. at 471–72, 374 A.2d 384. In *Girouard*, the Court of Appeals rejected taunts and verbal assaults as adequate provocation, even when taking on their humiliating and enraging character from antecedent events.

Antecedent events may be relevant in determining whether the triggering event in fact produced the hot blood necessary to rebut malice—they may support or detract from that nexus—but they do not suffice to give the triggering event a legal quality it does not otherwise have. Discovering one's spouse in an embrace with a paramour will not constitute adequate provocation because at some earlier time he or she committed adultery with that paramour. That is a matter for the divorce court; it does not reduce murder to some lesser offense. We find no error in the court's instructions.

## ROBIN'S STATEMENTS

As we indicated, Robin elected not to testify against her husband. Officer Wiley said that he appeared at the

scene within two minutes after he was called, that he was the first officer to respond, that Robin met him at the door, and that she was "very upset, crying, screaming, almost to the point of where she was hysterical." She remained "very upset, very hysterical, crying" even after Wiley entered the house and checked Bantz's body. Proffering, without the benefit of testimony, that some 20 minutes had actually elapsed since Robin first called the police and that, in the interim, she cleaned up the house and removed some drugs, appellant objected to Officer Wiley's testifying to any statements made by Robin on the ground that they did not constitute excited utterances.

Based on Officer Wiley's description of Robin's demeanor, the court found that those statements *were* excited utterances and allowed the testimony. Appellant now complains that the court based its ruling on Officer Wiley's perception of Robin's demeanor rather than on what her mental state actually was. That is not the case. Due to Robin's decision not to testify, the only evidence before the court on the issue was Officer Wiley's testimony, and, based on that testimony, we can find no error in the court's determination that her immediately contemporaneous statements to the officer related to what obviously was a startling event and were made while she was still under the stress of the excitement caused by that event. Md. Rule 5–803(b)(2).

JUDGMENTS AFFIRMED; APPELLANT TO PAY THE COSTS.