## BARBARA JEAN GILBERT *v.* STATE OF MARYLAND

[No. 956, September Term, 1976.]

*Decided May 18, 1977.*

The cause was argued before GILBERT, C. J., and MOYLAN and MASON, JJ.

*Joseph A. DePaul* and *William C. Brennan, Jr.*, with whom were *James E. Kenkel* and *DePaul, Willoner & Kenkel, P.A.* on the brief, for appellant.

*W. Timothy Finan, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *Daniel J. Cassidy, Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

In yet another of the legion of subsidiary issues spinning off from *Mullaney v. Wilbur*, 421 U. S. 684, 95 S. Ct. 1881, 44 L.Ed.2d 508 (1975), and *Evans v. State*, 28 Md. App. 640, 349 A. 2d 300 (1975), affirmed *State v. Evans*, 278 Md. 197, 362 A. 2d 629 (1976), we are in this appeal required to come to grips with the problem of how the State proves a negative element and with the inevitably attendant issue of the legal sufficiency of the evidence in that regard. In effect, we are asking, "How big a legal prize does a defendant win when he succeeds in 'bursting the bubble' of a *Thayer-Wigmore* presumption?" The answer is that he wins a significant procedural bonus but not, generally speaking, the total "jackpot" of an acquittal as a matter of law.

The appellant, Barbara Jean Gilbert, was convicted in the Circuit Court for Prince George's County by Judge William B. Bowie, sitting without a jury, of the first-degree murder

of her husband, as well as the use of a handgun in the commission of a crime of violence.

The key appellate issue before us is the legal sufficiency of the evidence in terms of 1) negating self-defense and 2) negating mitigation through provocation. Since this was a court trial, no problem of jury instructions is involved. Nor is the fact of the first-degree verdict (in terms of disproving hot blood, at least) at all foreclosing on the appellant's claim, because she objects to the right of the judge, as fact finder, even to consider such mental states as premeditation and deliberation. Hers is a flat claim of legal insufficiency.

The physical facts are undisputed. At shortly after 9:15 p.m. on April 14, 1976, the appellant intentionally shot her husband, William Gilbert, in the chest with a gun. He died the next day. Her homicidal agency is not contested. At issue, rather, is her state of mind as she pulled the trigger.

There was a great deal of testimony from both the State and the defense bearing upon the appellant's state of mind. It is unnecessary to recount it in detail since what is here at stake is not its quantitative measure but rather its qualitative significance. Sufficeth it to say that the appellant produced legally sufficient evidence to generate legitimate jury questions on the issues of both self-defense and provocation.[1] What are the legal consequences of the appellant's having done that?

We begin by looking to the operation of the model generally and then to the triggering effect of the proof in this case upon each successive step in that operation.

Homicide in Maryland comes in five varieties—1) justifiable, 2) excusable, 3) manslaughter, 4) second-degree

1. The theory of mitigation through provocation was based upon the appellant's recently acquired knowledge that her husband was having an adulterous affair with another woman. Were we dealing in this opinion with the substance of the defense of provocation, we might have a very real question over the issue of "cooling time" for the ostensible "hot blood." We point out most emphatically that we are not dealing in this opinion with the substance of the law of provocation, but are simply assuming, as a convenience, that a genuine jury issue in this regard was generated.

We use the phrase "genuine jury issue" as a term of art to mean "a genuine factual dispute," regardless of whether the fact finder is a lay jury or a judge.

murder and 5) first-degree murder. The *corpus delicti* and the homicidal agency are the same in each of these varieties; which is the formalistic way of saying that they all share the common denominator of 1) a corpse lying on the floor and 2) a suspect standing there with a smoking gun in his hand. The variations are not in the *actus* but in the *mens rea* of the actor — the degree of moral blameworthiness. We are not concerned with the usual question of "Whodunit?" but with the more psychic question of "Why he done it?"

In ascending the ladder of culpability, the State needs to establish that the killing was 1) not justified and 2) not excused in order to climb from the non-criminal first and second rungs up to the third rung, where criminally felonious liability first attaches. It must then establish that the killing was 3) not mitigated in order to climb on from the third rung (or manslaughter level) onto the higher rungs (where the killing is not mitigated and is, therefore, murder). It must finally establish premeditation and deliberation (or some equivalent such as felony-murder) in order to climb from the fourth rung (murder in the second degree) onto the fifth and top rung (murder in the first degree). It will be perceived that only the final probandum involves an affirmative element. The probandum required for each of the first three steps up the ladder of culpability is a negative element. Because such notions as justification, excuse and mitigation are not monolithic phenomena but come rather in infinite variety, anticipatory disproof of them in the abstract becomes a practical impossibility.

An example may serve to illustrate the absurdity of requiring anticipatory disproof of every consideration that might lower a homicidal *mens rea*. Posit a bank robber, armed and wearing a ski mask, apprehended at the bank door as a teller lies dead inside. It is hypothetically conceivable that the man in the ski mask is a trusted governmental agent who has, in the nick of time, saved the country from an archenemy, cleverly disguised as a bank teller. It is conceivable, but it is not likely. Indeed, it is so unlikely that we do not require the State to disprove, as a matter of course, all such possibilities in advance as an

element of its case. The catalog of things to be disproved would be endless. The State would have to prove that the bank robber was not a lawful executioner, a policeman in pursuit of a fleeing felon, a soldier in time of war, a threatened victim killing the teller in self-defense, the cleaner of a gun which went off by accident, a hot-blooded victim beaten by the teller, a hot-blooded combatant involved in a mutual affray with the teller, an outraged husband cuckolded by the teller, someone killing in imperfect self-defense, someone killing under imperfect duress, etc., *ad infinitum.* There are a number of reasons why we do not require such anticipatory disproof by the State, not the least of which is the devastating impact it would have upon judicial economy. At the most fundamental level, however, we do not require it, because to require it would be an absurdity.

The device by which this relief is accomplished is called a presumption. The presumption operates in favor of the State. Absent some legally sufficient indication to the contrary, the homicide will be presumed to be not justified, not excused and not mitigated. Under the due process clause as interpreted by *In Re Winship,* 397 U. S. 358, 90 S. Ct. 1068, 25 L.Ed.2d 368 (1970), and applied by *Mullaney v. Wilbur, supra,* such a presumption in a criminal case has constitutional limitations. It may shift to the defendant the burden of producing evidence sufficient to generate a genuine jury question as to one or more of the possible defensive issues. It may never shift to the defendant the heavier burden of ultimate persuasion.[2] In its lesser function of shifting to the defendant merely the burden of producing evidence, the presumption dissipates or totally disappears ("the bubble bursts") as soon as the defendant has met his lesser burden of producing enough evidence to generate a genuine jury question. At that point, the State no longer has the benefit of the presumption. The State then assumes the burden of disproving, beyond a reasonable doubt, the defensive issue which has been generated. For a fuller

---

2. The constitutional limitation does not so inhibit a presumption in a civil case. *Plummer v. Waskey,* 34 Md. App. 470, 368 A. 2d 478.

discussion of these different forms of presumption, their proper functioning and their appropriateness to the criminal law, see *Evans v. State, supra,* at 28 Md. App. 706-730.

Turning to the case at hand, the establishment of the fact that William Gilbert died and that the appellant was the homicidal agent gave rise initially to the presumption (in its properly limited sense of shifting simply the burden of going forward with evidence) that the killing was not justified, not excused and not mitigated. The evidence, emanating both from the State's case and from the defense, then generated, however, a genuine jury issue as to possible excuse, by way of self-defense, and an arguable jury issue as to possible mitigation, by way of hot-blooded response to legally adequate provocation. When we look to the legal sufficiency of the evidence to generate such defensive issues (and, thereby, to dissipate the presumptions to the contrary), we take that version of the facts most favorable to the defense. Assuming the truth of that most favorable version of the facts, the trial judge would be able to say, as a matter of law, that there was evidence sufficient to establish the elements of self-defense and of provocation. (We reiterate that we are not saying that the elements of provocation were established in this case; we are only making an assumption of convenience in this regard.) Once the judge makes a ruling of law that one or more presumptions are dissipated, the State constitutionally assumes its burden of disproving those defensive elements just as it must prove every affirmative element, by proof beyond a reasonable doubt.

The appellant does not here contend that the judge, sitting as a fact finder, did not place the appropriate burden of persuasion upon the State as to all elements, affirmative and negative. She urges rather the interesting point that when she successfully dissipated the presumptions of non-excuse and non-mitigation, that dissipation of the presumptions operated not simply to create genuine factual issues but went further and stripped the State's case of its legal sufficiency in those critical regards, so as to have required the trial judge to grant a judgment of acquittal as a matter of law. In effect, she claims that the judge was

clearly erroneous when he found her guilty of murder. We reject that thesis. The rejection is easy; the explanation therefor is somewhat more difficult.

Both the presumption, in the first instance, and the dissipation of the presumption, in the second instance, move the protagonists forward and backward upon the chessboard of proof. In order to appreciate the sweep and legal significance of each such move, it is necessary to examine the board itself. In *Trovato v. State*, 36 Md. App. 183, 373 A. 2d 78 (1977), we explained the stages of proof in the following terms:

> "Upon the spectrum of proof, three distinct bands are discernible. The two at either extreme of the spectrum are the domain of the judge in his capacity to make rulings of law. Within this domain, the judge does not weigh the evidence or apply any burden of proof. He rather takes that version of the facts most favorable to the party against whom the adverse ruling is contemplated and decides whether those facts 1) do not establish the necessary elements of the thing needing to be proved by that party or 2) are so clear and decisive that reasonable minds could not differ in resolving the question against that party. There is a broad intermediate zone, however, wherein reasonable minds might differ as to the facts and wherein different readings of those facts would dictate very different legal results. This band in the middle is the unfettered domain of the fact finder with the prerogative to resolve genuine factual disputes in either direction. Each band has its own set of legal consequences."

At one extreme is the State's "back court" or "end zone," wherein the State is vulnerable to a legal ruling, a directed verdict, against its case. Once the State has marshalled enough evidence to move out from this danger zone, it has moved out into that "mid-court" or "playing field" whereon the ball can bounce either way in the unfettered prerogative

of the fact finder. At the far extreme, is the defendant's "back court" or "end zone," wherein he is vulnerable to a legal ruling, in effect a directed verdict, against him, at least as to significant sub-issues of his case. When the State has advanced this far, it is entitled to a ruling of law in its favor, at least as to sub-issues, and is no longer vulnerable to the hazards and unpredictabilities associated with the fact finder.

A presumption, unlike an inference, has binding legal significance and, when unrebutted, moves the proof in a case into one end or the other of the spectrum of proof, where it is the judge's domain to rule upon evidentiary questions as a matter of law. In a homicide case, the presumptions of non-justification, non-excuse and non-mitigation move the proof on these issues to the point where, unless they are dissipated, the judge rules as a matter of law that they are established. In effect, he has directed a verdict against the defendant upon these sub-issues, although in a criminal case he cannot, of course, direct a verdict against the defendant as to the ultimate issue. Thus, in a jury trial, the jury receives no instructions upon these matters and is not entitled even to consider them. In a court trial, the judge does not consider these issues when he moves from his capacity as a legal referee to his other capacity of resolving factual disputes.

Against this background, we are called upon to assess the sweep and legal significance of the successful defense maneuver of dissipating a presumption. At the very least, it has the legal effect of relieving the defendant of a directed verdict against him on a significant sub-issue. It has the effect of getting the ball out of his own "end zone" and back onto the "playing field." Generally speaking, however, this is all of the effect which the dissipation of a presumption has. It precludes a directed verdict in either direction and creates a genuine jury issue, which the fact finder may resolve in either direction (under appropriate instructions, in a jury case, and according to the appropriate burden of persuasion).

The appellant urges more, however. She argues that the

legal effect of dissipating a presumption is not simply to get the ball out of her own "end zone," where a directed verdict could have gone against her, but serves to take it back, across the disputed middle ground of volatile fact-finding, all the way into the State's "end zone," where the State is now vulnerable to a directed judgment of acquittal against it. Her argument runs as follows: The State, theoretically, must prove the elements of non-justification, non-excuse and non-mitigation; it relies for that proof upon the presumption; the presumption, once dissipated, utterly disappears and the State is, therefore, bereft of any legally sufficient evidence as to these necessary elements to save it from a directed judgment of acquittal. The argument is subtle, and requires some subtlety by way of response.

When the State establishes a homicide and a homicidal agency and moves thereby to the very brink of a murder conviction, it has crossed en route two legally significant boundaries as it moves across the spectrum of proof. It has moved out from legal insufficiency and forward into the disputed middle ground of fact-finding, in the first instance, and has then moved on beyond that middle ground of fact-finding, to the point where it is unnecessary to prove presumed facts, in the second instance. Actually, two distinct procedural devices are at work, but the lesser has almost universally been ignored in the discussion of the greater. It is the legal presumption which, when unrebutted, carries the State all the way into the defense "end zone," where the judge directs verdicts in the State's favor to these key sub-issues as a matter of law. Generally obscured by that more significant presumption, however, is the silent, junior partner of a permitted inference of fact, which carries the State initially out of its own "end zone" into the mid-field of disputed fact-finding. This lesser step is not accomplished by the presumption itself, for a presumption never carries a party into the zone of disputed fact-finding. Indeed, in the criminal law, a presumption does not operate at all within the realm of the fact finder. A presumption, rather, carries a party out of the zone of disputed fact-finding into that very different zone where a judge makes evidentiary rulings as a

matter of law. The flaw in the appellant's argument is that although the presumption of a fact may have been dissipated, the permitted inference of that fact is not, thereby, automatically extinguished also. It may, as a survivor, have an independent life of its own. In this case, it does. The reason is obvious. The mere creation of a genuine doubt as to a fact is enough to dissipate the presumption of that fact, but that mere doubt is not enough to foreclose the permitted inference of that fact. The doubt simply places the question in the lap of the fact finder. It takes far less, defensively, to ward off disastrous consequences to oneself than to mount a fully effective counteroffensive and inflict equally disastrous consequences upon one's adversary.[3]

The thing that saves the appellant from the otherwise foreclosing effect of the presumption — the thing that *dissipates* the presumption — is evidence that is merely legally sufficient to raise the possibility of a defense. The fact finder may believe such evidence and the appellant is, for that reason, entitled to have the fact finder consider it. Just as the fact finder may believe it, so too may he utterly disbelieve it. In that case, it is as if the evidence had never been given. All that has occurred in a case such as this is that the appellant has generated a genuine jury issue. He does not suffer a directed verdict against himself; neither does he gain a directed verdict against the State.

This is typically the case when a presumption is dissipated. It is only in very rare instances that the defensive testimony will be so clear and decisive as to create a counter-presumption moving the proof backward, all the way across the disputed middle ground of the fact finder, into the "end zone" of the State, where the State becomes vulnerable to a directed judgment of acquittal against it if it cannot rebut the counter-presumption with some affirmative evidence of its own. A situation might well arise, in an area such as insanity, where the State would become

---

**3.** It is not uncommon for a defensive team to intercept a pass in its own "end zone." It is a far rarer occurrence, however, to run the interception back all the way into the opposing "end zone."

susceptible to a directed judgment of acquittal. If the State relied initially upon the presumption of sanity; the defendant rebutted that presumption by competent medical testimony establishing, with requisite medical certainty, the clear diagnosis of insanity; and the State then failed utterly to offer any countervailing and medically competent evidence of sanity, the defendant might well 1) not simply be shielded from a directed verdict against him but might, indeed, 2) be entitled to a directed verdict against the State. Where defensive testimony, on the other hand, depends upon the more easily questioned credibility of lay witnesses (if not, indeed, upon that of the defendant himself and his relatives and friends), it does not possess that clear and decisive character as to which reasonable minds could not differ. The fact that it *may* be believed is enough to get the defense before the jury; the fact that it *may not* be believed is enough to keep the State's case before the jury.[4] It was of just such situations that we spoke in *Evans v. State*, at 28 Md. App. 728:

> "When the defendant, therefore, produces evidence, he has in most cases simply generated an issue for the jury. The jury retains full prerogative to accept or reject the defensive evidence and it must be persuaded by all of the evidence that the defendant is guilty beyond a reasonable doubt. In some instances, however, where all evidence points toward the existence of the defense and where nothing in the State's case, circumstantial or otherwise, controverts the defense in any regard, the evidence may be so clear and decisive as to leave

---

4. There is yet another and more fundamental difference between the lay of the land when the presumption of sanity has been dissipated and the state of things when the presumptions of non-justification, non-excuse and non-mitigation have been dissipated. The State, put to its burden of proving sanity, is required to prove an affirmative element and may well be susceptible to a directed verdict against it, if it proves nothing. With respect to non-justification, non-excuse and non-mitigation, by way of contrast, the elements are negative — not the existence of a condition but the non-existence of a condition. While it may not be possible (as in the case of sanity) to infer something from nothing, it may well, as we shall see, be possible to infer nothing from nothing.

no issue of fact and to generate a counter-presumption (not a mere jury issue) and to entitle the defendant to a directed verdict as a matter of law. As a general rule, however, the defendant will simply generate a jury question."

In this case, the appellant has not established either that she shot in self-defense or shot in hot blood. She has simply established the possibilities that she *may* have done so. When we concurred in the dissipation of the presumptions which ran against her, we looked to that version of the facts most favorable to her. When, on the other hand, we now look to see whether the State should have a verdict directed against it on the grounds of legal insufficiency, we look to that very different version of the facts most favorable to the State. That version of the facts considers, as it must, the defense testimony as utterly disbelieved and, for that reason, as non-existent.

Positing the disbelief of defensive testimony, as we must, what we then have is the fact of homicidal agency unrelieved by any indication of justification, excuse or mitigation.[5] From that state of the facts, the fact finder is permitted to infer the lack of such justification, excuse or mitigation. More broadly stated, the principle is that from the utter absence of believed evidence as to the existence of a condition, the fact finder may infer the non-existence of the condition. He need not infer it, but he may. Thus, by the very nature of the elements involved, the State will not be vulnerable to a directed verdict [6] against it for the failure

[5]. Actually, the State in this case is blessed with some strong affirmative evidence indicating both the lack of self-defense and the lack of hot-blooded response to legally adequate provocation. We have deliberately refrained from cataloging it for fear of giving rise to the false conclusion that it is necessary to our holding. Our holding deals only with the bare minimum necessary to avoid a directed verdict on grounds of legal insufficiency. What the State possesses beyond that minimum may be very necessary to persuade the fact finder, but it is surplusage in terms of legal sufficiency.

[6]. We deliberately use the phrase "directed verdict" in a very generic sense to indicate the occasions when evidentiary rulings will be made as a matter of law. The effect will be the same, whether we are talking about permitting the case to go to the jury, in a jury trial, or we are considering whether the verdict of a judge is clearly erroneous, in a court trial. *Williams v. State,* 5 Md. App. 450, 459, 247 A. 2d 731; *Metz v. State,* 9 Md. App. 15, 23, 262 A. 2d 331.

to disprove a negative. It will, of course, be vulnerable to the normal risks and perils of non-persuasion.

Both the more far-reaching presumption and the less far-reaching inference are rooted in the common human experience that unexplained killings are probably (says the presumption) or at least may be (says the inference) murderous. When the credibility of the offered explanation (the attempted rebuttal) is, as is generally the case, no more than genuinely debatable (that is, less than so clear and decisive that reasonable minds could not differ as to its truth), it has simply raised the genuine possibility that the killing *may not* have been murderous. It follows then that the legal effect of the offered explanation is simply to parry the presumptive thrust but not the inferential thrust of this common human experience, which is the very wellspring of all our procedure.

The possibility of such an inference being drawn does not impose an unconstitutional burden upon a defendant. The State still bears the burden of persuasion beyond a reasonable doubt. The fact finder need not draw the permitted factual inference. In a jury case, the defendant is entitled to an appropriate instruction telling the jury that they should not so infer unless they are persuaded of the truth of the inference beyond a reasonable doubt. The only "burden" upon a defendant is the purely tactical decision of choosing to controvert the State's proof so as to help insure a reasonable doubt. (This is not a burden in the constitutional sense in which *Mullaney v. Wilbur* and *In Re Winship* speak.) To the extent to which the fact finder believes the defensive testimony, it is unlikely that he will draw the permitted inference beyond a reasonable doubt. To the extent to which the defensive testimony is disbelieved, the likelihood that the inference will be drawn becomes proportionately greater. The interplay of these possibilities is handled by the appropriate allocation of the heavy burden of persuasion to the State. This is the sum total of the constitutional protection in this regard to which a defendant is entitled.

Again, by the very nature of things, our conclusion could not be otherwise. Homicide frequently occurs where the suspect is the only living witness to the event. Generally speaking, the State cannot go into the brain of an accused to establish directly his state of mind. It is, of necessity, dependent upon an inference being drawn as to that state of mind from the circumstances of the homicide itself. Those circumstances are sometimes the mere fact of homicidal agency coupled with the absolute lack of any explanation. In this regard, an explanation which is utterly disbelieved is the equivalent of no explanation at all, if not worse. The prerogative of disbelief resides always in the fact finder. The very fact of homicidal agency, absent an ultimately believed explanation, gives rise at least to the permitted inference that the homicide was not justified, not excused and not mitigated. This is enough to shield the State from a directed verdict against it on the grounds of legal insufficiency.

If this were not so, an accused and a victim could walk into an empty room, a shot could ring out, and the accused could walk out alone, announcing cavalierly, "I killed him in hot-blooded response to legally adequate provocation." If nothing more were known, the State would suffer a directed judgment of acquittal on the murder charge, notwithstanding the possibility that the fact finder (court or jury) might utterly disbelieve the testimony as to provocation. Even more preposterously, an accused and a victim could walk into an empty room, a shot could ring out, and the accused could walk out alone, announcing nonchalantly and unconvincingly, "I killed him as he was about to choke me to death," or, "The gun went off by accident." If nothing more were known, the State would suffer a directed judgment of acquittal as to all charges of unlawful homicide, notwithstanding the possibility that the fact finder (court or jury) might utterly disbelieve the testimony as to self-defense or as to accident. A defendant cannot, by mere self-serving testimonial assertions, thus entitle himself to directed judgments of acquittal. It is only the device of the permitted inference which shields us from such outrageous consequences. The most that a defendant is

entitled to in this regard is the appropriate allocation of the burden of persuasion as to such disbeliefs to the State and the standard of proof beyond a reasonable doubt.

In this case, the trial judge, as fact finder, was entitled to disbelieve the evidence of both self-defense and hot-blooded provocation, as disbelieve he did. He was permitted to infer both non-justification and non-mitigation for the homicide which the appellant most clearly perpetrated. Under these circumstances, we cannot say that he was clearly erroneous in returning a judgment of guilty of murder in the first degree. *Williams v. State*, 5 Md. App. 450, 459, 247 A. 2d 731; *Metz v. State*, 9 Md. App. 15, 23, 262 A. 2d 331.

The remaining two contentions of the appellant need not detain us long. She claims that the record does not adequately reflect her intelligent waiver of formal arraignment or of her. right to trial by jury. A written waiver of formal arraignment is contained in the record. Her failure to object thereto at the trial also operates as a waiver. *Ayala v. State*, 226 Md. 488, 492, 174 A. 2d 160; *Wilkins v. State*, 5 Md. App. 8, 245 A. 2d 80. The record also fully reflects the free election of a court trial. Coincidentally, it also reflects an adequate waiver of trial by jury. In this State, however, we elect between equal trial modes. We do not waive a favored trial mode (trial by jury) in favor of an inferior or unfavored mode (trial by court). We elect between equally attractive and equally venerable modes of trial. *State v. Zimmerman*, 261 Md. 11, 273 A. 2d 156; *Miller v. Warden*, 16 Md. App. 614, 299 A. 2d 862.

The appellant's final contention is that there was no adequate hearing on the admissibility of her confession and, further, that the confession should not have been received in evidence. The short answer to the combined contentions is that she did not object to the admission of the confession. Maryland Rule 1085; *Hall v. State*, 6 Md. App. 356, 251 A. 2d 219.

*Judgments affirmed; costs to be paid by appellant.*