703 A.2d 1302

**Mohammed MOOSAVI**

v.

**STATE of Maryland.**

**No. 54, Sept. Term, 1997.**

Court of Special Appeals of Maryland.

Jan. 7, 1998.

Reconsideration Denied Jan. 27, 1998.

684

Joy L. Phillips, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Emmet Davitt, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Scott L. Rolle, State's Atty. for Frederick County, Frederick, on the brief), for appellee.

Submitted before MOYLAN, DAVIS and SONNER, JJ.

MOYLAN, Judge.

A seemingly insignificant little case may sometimes provide revealing insight into the fundamental operation of our criminal justice system. This may be such a case. In any event, we seize this case as a vehicle through which to offer, interspersed with our formal legal holdings, some observations on the basic nature of appellate review of a criminal conviction.

The numbing reality of senseless and tragic civilian bombings over the last half-decade has so sensitized the national temper that even a passing allusion to a "bombing" or to "blowing up" something will, inevitably, trigger an immediate and decisive reaction. The danger, of course, is that once mobilized to react immediately and decisively, we sometimes overreact. The trigger can easily become a hair-trigger. Locating the almost indiscernible line between reaction and overreaction, moreover, is something that is, generally speaking, beyond the competence of legal rulings and must, in our juridical system, be assigned to the "sensing" or the "feeling"—the proverbial common sense—of lay jurors.

### *The Present Case*

The appellant, Mohammed Moosavi, was convicted by a Frederick County jury of making a false statement involving a bomb threat in contravention of Md.Code Ann. Art. 27, § 151A. On this appeal, he raises two contentions:

1) The evidence was not legally sufficient to support the verdict; and

2) The trial judge erroneously permitted the State to call one Ginger Fogle as a rebuttal witness.

### Evidentiary Insufficiency: The Appellant's Claim

We would agree, if we could, with the appellant's first contention that the evidence was not legally sufficient to support his conviction, but we would do so for a reason totally unrelated to the appellate contention raised in that regard. Before turning to the very different reason why we think the evidence did not support the verdict, we deem it appropriate, for illustrative purposes, to explain in some detail why we reject the appellant's specific argument in that regard.

His position is that the total context of the incident should have made it clear that he never intended to bomb the Chevy Chase Bank or any of its branches and that any words he might have spoken even alluding to such a possibility were indisputably nothing more than the undifferentiated venting of anger and frustration. The appellant seems to accept the fact that he was charged with threatening to bomb the bank and confines his challenge to the legal sufficiency of the State's case to the absence of adequate proof of any actual intent or criminal *mens rea.*

### A Challenge To The Adequacy of Persuasion Is Not A Challenge To The Adequacy of Production

■ Before turning to the potentially dispositive issue which the appellant did not raise on appeal, we will, for the sake of argument and just for the moment, accept the context in which he raises his challenge and explain why his argument cannot prevail. In a lay sense, his argument is actually very persuasive. What he overlooks is that the questions of what is persuasive and who should win the persuasion war are not appellate concerns. *Owens–Corning v. Garrett,* 343 Md. 500, 521–22, 682 A.2d 1143 (1996) ("We refuse to reevaluate the evidence and invade the territory of the jury.")

From the point of view of the appellant's argument based on persuasiveness, it is unfortunate that he was not able to try the case before the three judges who are the members of this appellate panel. We would probably have been a good jury for him. We were not in the courtroom, of course, and had no opportunity to observe the demeanor and the manner of testifying of the witnesses. That, along with the austerely limited nature of the appellate function in assessing evidence, is the reason why our opinion as to what probably happened is of no legal significance. This is why we admonish appellate lawyers not to waste time making jury arguments to us, for what we coincidentally believe happened on the street or in the alley does not matter. *Nichols v. State,* 5 Md.App. 340, 352, 247 A.2d 722 (1968)("Our function is not to determine whether we would have come to a different conclusion from that of the lower court nor need we be convinced beyond a reasonable doubt of the appellant's guilt.")

Even from a cold transcript, however, appellate judges do, at least off the record, inevitably arrive at their personal and idiosyncratic beliefs as to what probably happened in any given case. The reason why such beliefs are seldom formally articulated, even by way of gratuitous *dicta,* is because what a judge might hypothetically have done had he been the fact finder has no connection with what he must do in his very different capacity as legal referee. This is one of those rare occasions, however, when articulating the normally unarticulated hypothetical of what we might have found had we been the fact finders may help to illustrate the wide range of fact finding that is possible in a controversial case and the significance of discrete bands of fact finding within that wider range.

On the bell-shaped curve of possible verdicts based on fact finding, the two extreme ends of the curve are the exclusive province of the judge as legal referee. In approximately two or three per cent of the cases, the evidence for a proposition may be so woefully inadequate that a judge must declare a forfeit: "No, as a matter of law." In approximately another two or three per cent of the cases, the evidence for a proposition may be so overwhelming and uncontradicted that a judge

must, at least in civil cases and on certain criminal issues, award an automatic victory: "Yes, as a matter of law."[1] *Trovato v. State*, 36 Md.App. 183, 188–90, 373 A.2d 78 (1977); *Fisher v. State*, 28 Md.App. 243, 248–51, 345 A.2d 110 (1975).

The bulging ninety-four to ninety-six per cent of the curve lying between those poles, however, is the autonomous domain of the fact finder, wherein the verdict may be: "Yes or no, as a matter of fact." Once the ball is properly on the playing field of fact finding, moreover, it is subject to random and eccentric bounces with no second-guessing by legal referees or umpires. Given the "unpredictability of the fact-finding sweepstakes," the verdict that comes through as a decided "long shot" is just as immune from appellate scrutiny or after-the-fact intervention as is the verdict that goes into the jury room as a "heavy favorite." *Fraidin v. State*, 85 Md.App. 231, 241–42, 583 A.2d 1065 (1991).

### A Very Likely Version of the Evidence

Had the three judges on this appellate panel been called upon, hypothetically, to render a verdict based on our view of the evidence, we acknowledge freely, albeit completely immaterially, that we would not have been persuaded beyond a reasonable doubt that the appellant was guilty of anything. We would not have been so persuaded even by the clear and convincing standard of persuasion. We would not have been so persuaded even by a bare preponderance of the evidence. *See Fisher v. State*, 28 Md.App. 243, 251, 345 A.2d 110 (1975)(an upward or downward shift in the burden of persuasion has no effect on the burden of production). With full support in the evidence, our more neutral and intermediate version of what probably happened would have been somewhat along the following lines.

---

**1.** Appellate lawyers, of course, frequently treat the narrow extremity which they would like to occupy in order to argue law rather than fact as embracing fully fifty per cent of the total curve. They never, however, treat the opposite extremity with proportionate generosity.

The appellant, a retired college professor residing in northern Virginia and a customer of the Chevy Chase Bank, incurred an erroneous charge on his account for $30 in membership dues to the Columbia Record Club, a membership which the appellant had apparently never contracted. In an attempt to correct the mistake, he wrote two letters to the bank requesting that the erroneous charge be removed. When the charge was not removed, the appellant began making telephone calls to the bank. On August 30, 1995, the appellant called the bank three times. During one of the phone conversations, he was connected with Rona Bowers, a bank customer service representative.

Ms. Bowers testified that on August 30, 1995, she received a call from a customer, verified confidential information on the account, and talked to him for ten or fifteen minutes. It is undisputed that the phone conversation was with the appellant. She testified that the caller had "an accent from, like a Middle East, or third world country," and that the caller was "irate," and "very angry." According to Ms. Bowers, they discussed the problem of the charge to the appellant's account. She described his frustration with not being able to solve his problem. She testified:

[MS. BOWERS]: He just started stating that he—he kept insisting that he wanted the charges taken off of his account. I explained to him that in order for that to happen—I repeated myself—

[THE STATE]: Uh-huh.

A: In order for that to happen, you must submit the documents. He began—he was very angry and somewhere in the conversation, that's when he began to state that he would blow up Chevy Chase bank if we didn't do what he wanted him to—what he wanted done.

Q: Okay. Did he tell you where he was going to blow up the bank?

A: He asked—he stated, I'm going to blow up the bank. Well, I'm going to blow up the Chevy Chase Bank. Where are you? In Frederick?

Q: And then—

A: And I asked him, well when would you blow up the bank? And he said, probably on Sunday.

As a result of this telephone call, Ms. Bowers called the security office and wrote up a report regarding the conversation.

In his defense, the appellant denied that he ever threatened to bomb the bank. The appellant testified that during the conversation on August 30, Ms. Bowers could not understand his accent and that when he could not get any satisfaction from her regarding the correction of his account, he told her,

> That the office is very disorganized because my $30 money that they have taken is about four months (sic) and I would like to be refunded to my account. And because of disorganization I'm going to write a letter to the president of the bank. That's all I told her, and then she suddenly hung up.

Even after being indicted, the appellant continued to behave like an outraged innocent. He came into the State's Attorney's Office of his own volition and insisted on talking with someone who was handling the case. Even though admonished by Assistant State's Attorney Theresa Rivera not to talk about the case and to get a lawyer, the appellant persistently tried to push "a bunch of documents" that he wanted her to see into her hand and kept talking about everything being "the bank's fault." He continued to talk about the "discrepancy in their account" and explained that "the reason why he called in the bomb threat was because he was very angry with the bank."

Ginger Fogle, a secretary in the State's Attorney's Office, was present during the conversation. She explicitly remembered the appellant's having said, "I didn't mean what I said, I didn't mean I would blow the place up, I was just mad."

### A Hypothetical Verdict Based on That Hypothetical Fact Finding

Had we hypothetically been the fact finders, we almost certainly would have found the appellant not guilty of anything. We would not have been persuaded that he intended to bomb the bank or that he intentionally threatened to bomb the

bank. Our "gut" reaction would probably have been that the appellant was an unsophisticated layman who experienced the frustrated helplessness that one sometimes suffers in attempting to communicate with an impersonal institution or an impersonal bureaucracy. He knew that the charge on his account was erroneous but his importunate letters went unanswered and his beseeching telephone calls were to no avail. His particular frustration was exacerbated by a language barrier and a painful difficulty in communication.

In exasperated frustration, he may, to be sure, have blurted out the word "bomb" but it would seem to us not to have been a genuine threat. His name, his telephone number, his address, and his bank account number were fully known to the ostensibly threatened executive on the other end of the telephone line. Even an amateur criminal should have more stealth than that. The appellant's target identification was at best badly blurred. He seemed to believe that the Chevy Chase Bank was located in Frederick but was clearly unsure. His response of "probably on Sunday" when asked when he would blow up the bank comes across as nothing more than the sputtering of a meaningless response, as verbal static produced by a state of exasperated excitement. In short, we would not have been persuaded that the appellant was guilty of threatening to bomb the Chevy Chase Bank.

Our benign view of what probably happened, however, is of no assistance to the appellant, for we were not his fact finders and what to believe is the exclusive prerogative of the fact finders. *Owens–Corning v. Garrett,* 343 Md. 500, 521–22, 682 A.2d 1143 (1996); *Fowler v. Benton,* 245 Md. 540, 545, 226 A.2d 556 (1967) ("[T]he verdict of a jury on a question of fact is conclusive on appeal. The jury alone have the right and power to judge of the weight of the evidence.")

The trial judge apparently viewed the evidence much as we do. Although essentially powerless to do anything about the verdict itself,[2] he reflected in his sentencing what seemed to

---

2. On a timely motion for a new trial, of course, based not on a claim that the verdict was not supported by the evidence (it was) but on the

be his view of the seriousness of the appellant's offense. The thirty-day sentence was suspended; the appellant was placed on two years of *unsupervised* probation; he was ordered to pay $125 in court costs. That was not a paradigmatic sentence for a threatened act of terrorism.

### Legally Significant Versions of the Evidence

This hypothetical version of how we would probably have viewed the evidence and of how the trial judge apparently viewed the evidence, of course, has no appellate significance. It is, after all, a neutral or intermediate version of the evidence. As such, it might have interest for an historian but not for an appellate court. It is only the two most slanted versions of the evidence that have operative legal significance for purpose of appellate review.

### The Defendant's Most Favorable Version of the Evidence

Had the questions in issue been such things as whether the defendant had generated a genuine jury issue, to wit, a *prima facie* case, with respect to, *e.g.,* entrapment, self-defense, or mitigation or whether there had been enough evidence to support a defense-requested jury instruction, the appellate court and the trial judge alike would then have looked to that extreme version of the facts most slanted in favor of the defendant. *Gilbert v. State,* 36 Md.App. 196, 201, 373 A.2d 311 (1977); *Garland v. State,* 29 Md.App. 27, 28, 349 A.2d 374 (1975). In this case, the version of the evidence most favorable to the appellant, of course, would be that he never even uttered the words "bomb" or "blow up" at all and that any consideration of his state of mind or of what he intended to

---

very different ground that the verdict was against the weight of the evidence, the judge could have vacated the guilty verdict and ordered a new trial. Apparently, no such motion was made. Had it been made and denied, of course, it would have been immune from appellate review, for it would have been an unreviewable instance of a judge exercising his extraordinary fact-finding prerogative, sitting, in effect, as a thirteenth juror. *See Tibbs v. Florida,* 457 U.S. 31, 42, 102 S.Ct. 2211, 2218, 72 L.Ed.2d 652, 661 (1982).

communicate by such words would be, therefore, completely obviated. That extreme defense-favoring tilt to the evidence, however, does not figure in the present appeal.

### The State's Most Favorable Version of the Evidence

The extreme contrary version of the evidence, the one that does figure in this appeal, is that which is tilted as far as possible in favor of the State. That tilt is why the appellant's evidentiary insufficiency argument cannot prevail. With respect not only to the propriety but also to the necessity for utilizing such a "slant, with its unabashed and deliberately built-in partiality," we explained in *Fraidin v. State,* 85 Md. App. 231, 241, 583 A.2d 1065 (1991):

> The appellant's brief and especially his reply brief are almost strident in their outrage at the State's brief for putting a decidedly pro-prosecutorial "spin" or "twist" on evidence which was hotly disputed and subject to arguably diametric interpretations. On the issue of legal sufficiency, however, both the state *and the appellant* are enjoined to apply just such a "spin." The slant is required as a matter of law. Of all possible versions of events that would be permitted a fact finder, it is, of course, the most partial one permitted by logic and law which we adopt when assessing the legal sufficiency of the State's case. Fact finding impartiality has nothing to do with measuring a *prima facie* case.

(Emphasis in original).

The time-honored test for whether the State has met its burden of production, requiring the trial judge to submit to the jury the issue of the appellant's guilt, is whether the State's most favorable scenario—assuming full credibility of the State's witnesses, assuming maximum weight given to the State's evidence, utterly discounting the defense evidence, and drawing every permitted inference in favor of the State— would establish each component element of the crime. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Wilson v. State,* 319 Md. 530, 535–36, 573 A.2d 831 (1990); *West v. State,* 312 Md. 197, 207, 539 A.2d 231

(1988) ("The constitutional standard of review is whether after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.")

 The appellant's contention is that the State's evidence was not legally sufficient to show that he had any criminal intent. We hold quite to the contrary. Although the State's evidence may not have been very persuasive, it was abundantly ample to satisfy the State's burden of production.[3] *Williams and McClelland v. State*, 5 Md.App. 450, 459–60, 247 A.2d 731 (1968); *Metz v. State*, 9 Md.App. 15, 23–24, 262 A.2d 331 (1970).

Rona Bowers testified that in the course of a telephone conversation on August 30, the very angry appellant, in an accent that seemed to identify him as being from a Middle Eastern or third world country,[4] stated "that he would blow up Chevy Chase Bank if we didn't do ... what he wanted done." He persisted, "I'm going to blow up the bank. I'm going to blow up Chevy Chase Bank. Where are you? In Frederick?" He further pinpointed the probable target time as "on a Sunday." In a very damaging admission to Assistant State's Attorney Theresa Rivera, the appellant acknowledged that "the reason why he called in the bomb threat was because he was very angry with the bank." Far from being remorseful or apologetic, he continued to insist that "it's the bank's fault." Focusing, as it had the prerogative to do, on those facts and

---

3. To meet the heavy burden of persuasion, the State 1) must persuade the jury to believe its witnesses, 2) must persuade the jury to give great weight to its evidence, 3) must persuade the jury to discredit all or much of the defense evidence, and 4) must persuade the jury to draw necessary inferences in favor of the State. That can be hard to do and that is why there are many jury verdicts of "not guilty." To meet its burden of production, by contrast, the State does not have to persuade anybody of anything. *McCoy v. State*, 118 Md.App. 535, 703 A.2d 237, No. 107, Sept. Term, 1997 (1997). It enjoys the benefit of automatic assumptions in those regards as a built-in part of the appellate formula for measuring a *prima facie* case.

4. Politically insensitive as it may be, jurors do sometimes indulge their xenophobic prejudices and give sinister significance to such things.

on nothing else, the jury could permissibly have inferred that the appellant meant to do exactly what he said he was going to do.

That, of course, is obviously a version of events vastly different from the one we earlier recited. Coincidentally, we do not believe it to be an accurate version, but our belief in that regard is immaterial. It is, however, a conceivable version.[5] It is, more to the point, the pro-State version that the appellant is stuck with when he argues that the evidence was not legally sufficient to permit a conviction. On the issue of the appellant's criminal intent, therefore, the trial judge was not in error in submitting the case to the jury. What the jury then did by way of a verdict is unreviewable. *Safeway Stores, Inc. v. Barrack*, 210 Md. 168, 173, 122 A.2d 457 (1956) ("There is no merit in the appellant's contention that 'the evidence overwhelmingly preponderated against the verdict.' The weight and preponderance of the evidence is for the triers of fact and cannot be reviewed on appeal.")

### Evidentiary Insufficiency: A Different Claim That Might Have Prevailed

Ironically, the appellant had a far more lethal weapon readily at hand bearing on the legal insufficiency of the State's evidence, had he chosen to unlimber it on appeal. Even more ironically, it was an issue expressly raised and fully developed at the end of the entire case before the trial court and, therefore, thoroughly preserved for appellate review.

After moving for a judgment of acquittal on the grounds of evidentiary insufficiency, the appellant offered as the exclusive thrust of his argument [6] that even if the State's version of the

---

5. It might well be an instructive *Rashomon*-like exercise for a law school class—or a literature class, for that matter—to be given the transcript of a criminal trial and then to be required to compose three different narratives: 1) the defense's best scenario, 2) the State's best scenario, and 3) one of any number of more neutral or intermediate scenarios. The same source material may generate myriad scenarios.

6. It is also ironic that if the appellate contention that was made with respect to the lack of criminal intent had had merit, we would have had

evidence were to be believed, the appellant was charged with the wrong crime. He pointed out that the State's evidence, if believed and given its most sinister connotation, might have supported a conviction for a violation of what is now Md.Code Ann. Art. 27, § 9 (1996 Repl. Vol.), which provides:

A person may not threaten either verbally or in writing to:

(a) Set fire to or burn a structure; or

(b) Explode a destructive explosive device as defined under § 139B of this article in, on, or under a structure.

That law has been on the books since 1989 and proscribes the making of a threat to burn down a building or to explode a bomb in or under a building. The State's evidence in this case might have, as we have discussed at length, supported the conviction of the appellant for having verbally threatened to bomb the Chevy Chase Bank.

The appellant, by contrast, was convicted of having committed a very different crime, to wit, with having violated § 151A, which provides, in pertinent part:

A person is guilty of a misdemeanor if, knowing the statement or rumor to be false, he circulates or transmits to another or others, with intent that it be acted upon, a statement or rumor, written, printed, or by word of mouth, concerning the location or possible detonation of a bomb or other explosive.

Section 151A has been on the criminal statute books since 1963. It is placed in Article 27 under the general rubric of "False Statements," along with a number of other sections dealing with the making of false reports: Section 150, concerning false statements to police officers; Section 151, concerning false statements to State officials or agencies; Section 151B, concerning false statements when applying for funds from the Maryland Higher Education Commission; and Section 151C, concerning the possession or manufacture of devices designed

---

no choice but to dismiss it on the ground that it had not been adequately preserved for appellate review by virtue of not having been argued before the trial judge.

to look like destructive explosive devices so as to terrorize or frighten others. Following almost immediately thereafter is Section 156, concerning turning in false fire alarms and making false ambulance or rescue squad calls; and Sections 156A through 156E, dealing with the false activation of burglary and robbery alarms.

The difference between the maximum penalties for a § 9 violation and a § 151A violation is revealing. Actually to threaten to explode a bomb, pursuant to § 9, could subject the perpetrator to ten years imprisonment. To make a false report with respect to a bomb threat, pursuant to § 151A, involves a maximum penalty of no more than one year. Indeed, to transmit a false rumor with respect to a bomb, pursuant to § 151A, involves a maximum penalty far less severe than the turning in of a false alarm of fire, under § 156, which can involve a sentence of up to five years.

### Circulating False Rumors Versus Actually Making Threats

The key verb of § 9, the crime tried but not charged, is "threaten." The act proscribed is to "threaten . . . to . . . explode a destruction explosive device." When one threatens to explode a bomb, § 9 is the criminal statute that has been violated. It makes no difference whether the maker of the threat actually intended to carry out the threat or made a false threat without the remotest intention of carrying it out. It is the making of the threat itself, whether it be true or false, that is the gravamen of the offense. Although the appellant may conceivably have done that, he was not charged with that.

By significant contrast, the key verbs of § 151A, the crime that was charged, are "circulate or transmit." The act proscribed is to circulate or transmit a false "statement" or false "rumor" "concerning the location or possible detonation of a bomb." It is clear that § 151A does not involve the actual making of a threat by the would-be perpetrator to explode a bomb at some future time. The gravamen of § 151A is the

passing on or the transmitting of a false report or a false rumor with respect to the existing location and/or the possible detonation of an existing bomb. It is closely akin to the turning in of a false alarm of fire.

The crime has a complex *mens rea.* It starts with a statement or a rumor about an already existing bomb-related circumstance *which the offender knows to be false.* That's a *scienter* requirement. It concerns something *in esse* rather than *in futuro.* "There's a bomb in your building about to go off!" The gravamen of the offense is that the offender then "circulates or transmits to . . . others" the false statement or false rumor, *intending that it be acted upon.* That's a specific intent. The target of the criminal sanction is the malicious prankster who perpetrates expensive and disruptive hoaxes in the form of bomb scares. The social harm, in addition to the very real fear engendered, is the hundreds and thousands of man hours that are lost as schools, office buildings, and courthouses are evacuated, with hundreds of employees forced to stand idly on the street while the Bomb Squad scans a building in vain.

### Section 9 Is Not Subsumed Into Section 151A

When called upon at trial, in response to the appellant's motion for a judgment of acquittal at the end of the entire case, to respond to the charge that the appellant was being tried for the wrong crime, the State treated that question as immaterial. Its position was that even if the appellant could have been convicted of threatening to explode a bomb in contravention of § 9, that fact would not preclude his action from also constituting a violation of § 151A.

The State's position was that if the appellant threatened to explode a bomb, knowing full well that he had no intention of doing so, that was, *ipso facto,* the transmitting of a known false statement concerning the possible detonation of a bomb. The State's further position seemed to be that if the appellant intended by his threat to coerce the bank into removing the erroneous charge from his account, that satisfied the specific

intent element, to wit, that he transmitted the false statement "with intent that it be acted upon."

Push and squeeze as it may, however, the State cannot fit either the appellant's actions or § 9 itself into the framework of § 151A. Even if the direct, first-person uttering of a threat could somehow be deemed the circulating or the transmitting of a statement or a rumor, the crime spelled out by § 9 still cannot be subsumed into the crime spelled out by § 151A. The anomaly would be bizarre.

To threaten to explode a bomb under § 9, whether there be any intent to carry out the threat or not, is a general intent crime. Section 151A, on the other hand, is a specific intent crime. The making of the threat must have the further purpose of bringing about a more remote result. There is the further requirement that the threat actually be a false threat. Section 151A has yet another element that § 9 does not, the *scienter* requirement that the statement transmitted not only be false but *be known to be false* at the time of the transmission. With at least three additional elements—the falsity of the threat, the known falsity of the threat, and the specific intent that the threat be acted upon— § 151A would have to be considered the greater inclusive crime. Threatening to bomb under § 9, a crime carrying a potential ten-year sentence, would, in at least some of its factual manifestations, therefore, be subsumed as a lesser included offense within § 151A, carrying the maximum imprisonment of but one year.

Someone such as the appellant, moreover, could for precisely the same actions be tried under § 9, with the risk of ten years imprisonment, or under § 151A, with the risk of only one year's imprisonment. It would, moreover, be far easier to convict him of the ten-year offense, with at least three less elements to be proved and with no possible defense of voluntary intoxication available for the general intent crime.

Our statutory interpretation is that the Legislature never intended to create so absurd a result. We reject the State's reading of § 151A that would produce such a result.

*Evidentiary Insufficiency: The Potentially*
*Viable Claim That Is Not Before Us*

■ Even taking that version of the evidence most favorable to the State, § 151A was not even of the type of offense arguably perpetrated by the appellant. There was no false statement or rumor already in existence that he knew to be false and that he circulated to others with the intent that the Chevy Chase Bank, for instance, be evacuated. That is the type of thing that is meant by § 151A's "with the intent that [the false rumor] be acted upon." The evidence simply did not fit the crime charged (§ 151A) and, therefore, was legally insufficient to support the conviction.

What then shall we make of this unusual instance or variety of legal insufficiency? Unfortunately from the appellant's point of view, nothing. The appellant has waived any argument he might have had with respect to this particular issue. The appellant did not in any way raise this issue or argue it in his appellate brief. Oral argument was waived. Just as the appellant has not raised this theory of evidentiary insufficiency directly, neither is it raised by implication.

*The Need for Particularity On a Motion*
*for a Judgment of Acquittal*

In the analogous circumstance dealing with the degree of particularization required to preserve an issue in the context of a Md. Rule 4–324(a) Motion for Judgment of Acquittal, *Lyles v. State,* 63 Md.App. 376, 492 A.2d 959 (1985), thoroughly analyzed the need for particularization. Speaking for this Court, 63 Md.App. at 379, 492 A.2d 959, Judge Robert M. Bell (now Chief Judge of the Court of Appeals) held:

> We agree with the State that this issue has not been preserved for review. *Appellant moved for judgment of acquittal at the end of the State's case and at the end of all of the evidence. On neither occasion did he present argument in support of his motion.* In fact, in response to the

judge's question, whether he wished to be heard in connection with the motion at the end of the evidence, his counsel responded, "I'll waive." We agree that *without intending to do so, he did, in fact, "waive" the argument.*

(Emphasis supplied).

That holding was affirmed by *State v. Lyles,* 308 Md. 129, 135–36, 517 A.2d 761 (1986) and reaffirmed by *Muir v. State,* 308 Md. 208, 218–19, 517 A.2d 1105 (1986). *See also Garrison v. State,* 88 Md.App. 475, 478, 594 A.2d 1264 (1991); *Graves v. State,* 94 Md.App. 649, 683–85, 619 A.2d 123 (1993).

In *Dillsworth v. State,* 66 Md.App. 263, 503 A.2d 734 (1986), we held that a generic trial motion on the ground of legal insufficiency was not enough to preserve for appellate review a specific argument with respect to the lack of specific intent to maim, disfigure, or disable. Judge Alpert held, 66 Md.App. at 267, 503 A.2d 734:

> At the close of the defense's case below, *appellant's counsel moved for a judgment of acquittal "on the grounds [that] there is insufficient evidence* to establish the intent to commit such a crime."

> *As no argument was made below on this precise issue, it is not preserved* for our review.

(Emphasis supplied).

In *Brooks v. State,* 68 Md.App. 604, 515 A.2d 225 (1986), we held that a generic trial motion on the ground of legal insufficiency was not enough to preserve for appellate review a specific argument with respect to the lack of specific intent to destroy, injure, deface, or molest property. Judge Bloom held, 68 Md.App. at 611, 515 A.2d 225:

> [T]he Rule also requires the defendant to "state with particularity all reasons why the motion should be granted," and we have held that *a motion which merely asserts that the evidence is insufficient* to support a conviction, *without specifying the deficiency, does not comply with the Rule*

*and thus does not preserve the issue of sufficiency for appellate review.*

(Emphasis supplied).

### The Need for Particularity For Appellate Consideration

■ By parity of reasoning, the same particularization is required when a party seeks to place a specific legal question before an appellate court for consideration. The appealing party is required to list the precise contention in his brief and then, in the course of the brief, to argue that issue with particularity. Rambling thoughts that may come to mind in the course of appellate oral argument are not enough to place an issue before the appellate court. At least as early as 1939, the Court of Appeals spoke to this requirement in *Fidelity and Deposit Co. v. Mattingly Lumber Co.*, 176 Md. 217, 220, 4 A.2d 447 (1939):

> Appellant's demurrer to this declaration was overruled, but since the correctness of that ruling was not raised in its brief nor in argument, any objection thereto may ... be treated as abandoned.

In our case, to be sure, the inappropriateness, and therefore the inadequacy, of the evidence to show a violation of § 151A was squarely raised and argued at the trial level. In view of the failure of the appellant to raise this argument on appeal, however, the issue is not before us. In *Bishop v. Board of County Commissioners*, 230 Md. 494, 500, 187 A.2d 851 (1963), Chief Judge Brune was very emphatic in this respect:

> *One question of law which was raised in the trial court has not been urged on appeal. We therefore do not decide it.* ... The trial court held this provision unconstitutional. The appellants do not challenge this holding and we, therefore, do not pass upon it.

(Citations and footnote omitted; emphasis supplied). In *Pride Mark Realty v. Mullins*, 30 Md.App. 497, 511, 352 A.2d 866 (1976), Judge Lowe, speaking for this Court, was equally emphatic:

*When an issue, although raised below, is not raised on appeal, it is not before us* and we are as completely denied the right to review such question as if the appeal were premature or had not been taken at all. This appeal will be dismissed.

(Emphasis supplied). *See also Harmon v. State Roads Commission,* 242 Md. 24, 30–32, 217 A.2d 513 (1966); *Nutter v. City of Baltimore,* 232 Md. 210, 213, 192 A.2d 477 (1963); *Dessel v. Goldman,* 231 Md. 428, 430–31, 190 A.2d 633 (1963)("[T]he question of the propriety of the allowance of costs was not presented as a question or argued in appellant's brief, and we do not consider it to be before us for review."); *State Roads Commission v. Halle,* 228 Md. 24, 31, 178 A.2d 319 (1962)("But neither under this heading nor the heading of 'Argument' in its brief does [the appellant] present any argument in support of its contention on this point, nor do the appellees deal specifically with the question. Under these circumstances, we conclude the point has been waived."); *State for the Use of Peach v. Cavey,* 173 Md. 445, 447, 196 A. 303 (1938)("Counsel for appellant confine their argument to the exception relating to the ruling upon the prayers, hence the remaining exceptions will be treated as abandoned.")

In *Ricker v. Abrams,* 263 Md. 509, 516–17, 283 A.2d 583 (1971), the appellant, as in the present case, failed to raise a point either in brief or in argument. The point, therefore, was self-evidently not before the appellate court for consideration:

Since Mrs. Ricker did not raise this point in her brief or in argument before us, we must regard it as having been waived, *Eggert v. Montgomery County Council,* 263 Md. 243, 282 A.2d 474 (1971); *Wooddy v. Wooddy,* 256 Md. 440, 450–51, 261 A.2d 486 (1970); *Mullins v. Thorne,* 254 Md. 434, 437, 255 A.2d 409 (1969).

In *Jacober v. High Hill Realty, Inc.,* 22 Md.App. 115, 125, 321 A.2d 838 (1974), an issue was actually raised in oral argument before the appellate court although it was not presented in the brief. Although the appellant there did far

more than the appellant here has done, this Court nonetheless declined to consider the issue:

In addition, appellants at oral argument contended settlement negotiations were responsible for the delay. We decline to consider the argument as it was not presented in the brief.

In *Reid v. State*, 10 Md.App. 6, 10–11, 267 A.2d 332 (1970), the appellant, unlike the appellant here, at least attempted to raise an issue by way of filing a subsequent brief. Speaking for this Court, Judge Orth held that even that was not enough to bring the issue properly before us for consideration:

Appellant's brief . . . did not present the point although it was as apparent then as later. We have consistently held that there is no provision by statute or rule for the filing of supplemental briefs and have refused to accept them. We see no reason here to depart from that practice. As the point was not presented and argued in a brief properly filed, we need not consider it.

(Citations omitted).

In *Langworthy v. State*, 284 Md. 588, 399 A.2d 578 (1979), the appellant sought to contest the propriety of his institutionalization following a finding of insanity. Because his appellate brief, however, had raised only challenges as to his underlying conviction for rape, his effort to raise the issue of the insanity adjudication was futile. Speaking on that occasion for the Court of Appeals, Judge Orth held, 284 Md. at 595–96, 399 A.2d 578:

Except for the bald assertion that there was "an involuntary insanity plea," Langworthy's notice of appeal attacked the verdict under the general plea that he was guilty of the substantive offense. *The 40-page brief which he submitted to the Court of Special Appeals did not argue the insanity finding. It went to his conviction of rape,* and it was the claims relating thereto which were re-argued in the reply brief to the State's brief controverting them. *Thus, Lang-*

*worthy put properly before the intermediate appellate court only the propriety of the verdict that he was guilty of rape.*

(Footnote omitted; emphasis supplied).

Maryland Rule 8–504(a) sets out the required contents of an appellate brief. It provides, in pertinent part:

A brief shall contain the items listed in the following order:

. . .

(3) A statement of the questions presented, separately numbered, indicating the legal propositions involved and the questions of fact at issue expressed in the terms and circumstances of the case . . .

(5) Argument in support of the party's position.

In dealing with an earlier manifestation of that precise Rule, *Hyde v. State,* 228 Md. 209, 218, 179 A.2d 421 (1962), held:

Maryland Rule 831 . . . provides that appellant's brief shall contain "a succinct statement of the questions presented separately numbered," and "argument in support of the position of the appellant." *Appellant's brief contains neither in respect to the matter now under consideration, and we have held that a question not presented or argued in appellant's brief was not before the Court of Appeals, although it was brought to the attention of the Court during argument.* And even constitutional rights may, ordinarily, be waived by failing to comply with procedural requirements to preserve the right to appellate review.

(Citations omitted; emphasis supplied).

██ An issue does not qualify for appellate consideration simply because of its close association with other issues that are properly before the Court. In *DeGroft v. Lancaster Silo Co.,* 72 Md.App. 154, 527 A.2d 1316 (1987), the plaintiff-appellant had suffered summary judgment against him on all three counts of his complaint. On appeal, we reversed, holding that summary judgment had been improperly granted on the first and third counts. Notwithstanding the fact that the second count was tightly sandwiched between the other two, no issue with respect to it had been expressly raised or argued

in the appellant's brief. Judge Bloom held squarely, 72 Md. App. at 159, 527 A.2d 1316, that nothing with respect to that count was properly before us for consideration:

*We shall not address the question* of the propriety of the grant of summary judgment on the second count (negligence) *for the simple reason that appellant did not present or argue the issue in his brief.* Rule 1046 f provides that "This Court may decline to *hear or consider* oral argument on any legal proposition or question of fact not presented in the briefs."

(Emphasis in original; emphasis supplied).

In *Monumental Life v. U.S. F. & G.*, 94 Md.App. 505, 544, 617 A.2d 1163 (1993), Judge Alpert was equally emphatic:

Pursuant to Md. Rule 8–504(a)(5), "A brief [filed before an appellate court] *shall* contain ... [an a]rgument in support of the party's position." The use of the word "shall" indicates that the provision is mandatory, and that the consequences of noncompliance are those prescribed by the Maryland Rules or by statute. *See* Md. Rule 1–201(a). In the instant case, the effect of noncompliance with Rule 8–504—as in the case where a brief does not *contain* the party's argument, but merely *makes reference* to an argument contained elsewhere—is set forth in Md. Rule 8–504(c):

For noncompliance with this Rule, the appellate court may dismiss the appeal or make any other appropriate order with respect to the case[.]

Consequently, we need not—and, indeed, choose not to—consider the merits of Monumental's argument concerning the refund of the payments made by USF & G and Cal Union.

(Emphasis in original; footnote omitted).

We are, perhaps, carrying coals to Newcastle, but we wish to make the point that the appellant has not raised by indirection the potentially viable claim as to evidentiary insufficiency that he clearly has not raised directly. The evidentiary insufficiency claim that the appellant has raised lacks merit.

The very different evidentiary insufficiency claim that potentially has much merit has not been raised.

Lest any be tempted to sympathize unduly with an appellant who seems to have a grievance without an available remedy, let it be noted that it was the appellant who created his own untenable position. It was the appellant who, in the first instance, elected to be tried by a jury rather than by the court, with all of the implications of that election with respect to who was more likely to be persuaded by what. It was the appellant who, in the second instance, elected not to pursue on appeal his earlier contention that he had been charged with and was being convicted of the wrong crime.

### A Discretionary Call: Allowing a Rebuttal Witness

The appellant's remaining contention will not detain us long. During its case-in-chief, the State called Ms. Rivera of the State's Attorney's Office to testify to a conversation which took place in her office with the appellant. Her testimony included an admission by the appellant that "the reason why he called in the bomb threat was because he was very—he was very angry with the bank." In his defense, the appellant testified that he mistakenly went to the state's Attorney's Office and that Ms. Rivera invited him to sit down but that he refused to discuss the matter and left to find the Public Defender's Office. Additionally, during cross-examination, the appellant denied ever making any statement to Ms. Rivera concerning the incident.

Over a defense objection, the State called Ginger Fogle as a rebuttal witness to impeach the appellant's credibility by contradicting the assertion raised by the defense that the appellant never made any statement concerning the threat to Ms. Rivera. Ms. Fogle testified that she was present during the conversation between Ms. Rivera and the appellant, and that the appellant had stated "I didn't mean what I said, I didn't mean I would blow the place up, I was just mad."

The appellant contends that the trial court erred in allowing the State to call Ms. Fogle during rebuttal because she was a

factual witness who should have been called during the State's case-in-chief. Additionally, the appellant argues that Ms. Fogle's testimony was not responsive to any new matter raised during the defense case, and that she was called only for the purpose of buttressing the credibility of the state's witness.

The question of what constitutes rebuttal evidence rests in the sound discretion of the trial court, the exercise of which will not be reversed unless the ruling is both "manifestly wrong and substantially injurious." *Huffington v. State,* 295 Md. 1, 14, 452 A.2d 1211 (1982) (quoting *State v. Hepple,* 279 Md. 265, 270, 368 A.2d 445 (1977)). "In order to justify reversal the testimony must be sufficiently egregious to satisfy this test." *Hardaway v. State,* 72 Md.App. 592, 602, 531 A.2d 1305 (1987), *rev'd on other grounds,* 317 Md. 160, 562 A.2d 1234 (1989). Because we do not find the admission of Ms. Fogle's testimony to have been "manifestly wrong" or "substantially injurious," we find no abuse of discretion by the trial court in allowing such rebuttal evidence.

*JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.*